[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 7, 2009
THOMAS K. KAHN
CLERK

No. 07-10524

_____

D. C. Docket No. 02-00329-CR-T-17-EAJ

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOAQUIN MARIO VALENCIA-TRUJILLO,
a.k.a. El Joven,
a.k.a. El Abogado,
a.k.a. Oscar Martinez,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 7, 2009)

Before TJOFLAT and CARNES, Circuit Judges, and HOOD,* District Judge.

---

* Honorable Joseph M. Hood, United States District Court for the Eastern District of Kentucky, sitting by designation.

CARNES, Circuit Judge:

"Panama Express" sounds like the name of a train running through Central America, and in a sense it was. It is the code name of a joint operation in which the Coast Guard and a virtual alphabet soup of federal law enforcement agencies (FBI, DEA, ICE, IRS), assisted by state and local agencies, investigated and infiltrated an international drug smuggling and distribution ring in South and Central America. The criminal enterprise was huge, and the Panama Express had a successful run. In its first seven years it hauled in over 600 tons of cocaine, worth about $8 billion, along with more than 1,200 convictions. This appeal involves one of those convictions.

Joaquin Mario Valencia-Trujillo, a Colombian citizen, organized and led the criminal enterprise. After Colombia extradited him to this country, Valencia-Trujillo was convicted by a jury of money laundering and several drug crimes. He was sentenced to 480 months imprisonment and ordered to forfeit $110 million. His appeal brings us issues involving the rule of specialty in international extradition, the Grand Jury Clause of the Fifth Amendment, Franks v. Delaware, Batson v. Kentucky, and the sufficiency of the evidence.

**I.**

Valencia-Trujillo first contends that the district court violated the rule of

specialty by prosecuting him for offenses beyond those Colombia authorized in his extradition papers. The rule of specialty "stands for the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state or else must allow that person an opportunity to leave the prosecuting state to which he or she had been surrendered." United States v. Gallo-Chamorro (Gallo-Chamorro I), 48 F.3d 502, 504 (11th Cir. 1995) (quoting United States v. Herbage, 850 F.2d 1463, 1465 (11th Cir. 1988). The rule is grounded in concerns of international comity. Gallo-Chamorro v. United States (Gallo-Chamorro II), 233 F.3d 1298, 1305 (11th Cir. 2000). As we have explained, "[b]ecause the surrender of the defendant requires the cooperation of the surrendering state, preservation of the institution of extradition requires that the petitioning state live up to whatever promises it made in order to obtain extradition." Id.

**A.**

On August 22, 2002, a grand jury returned a four-count indictment against Valencia-Trujillo. Counts I, II, and IV were conspiracy allegations. Count I charged that Valencia-Trujillo conspired to import five or more kilograms of cocaine into the United States in violation of 21 U.S.C. §§ 952 and 963. Count II charged that he conspired to possess five or more kilograms of cocaine with the

3

intent to distribute it in the United States in violation of 21 U.S.C. §§ 959 and 963. Count IV alleged that he conspired to commit money laundering in violation of 18 U.S.C. § 1956(a)(1), (a)(2), and (h).

Count III alleged that Valencia-Trujillo conducted a continuing criminal enterprise in violation of 21 U.S.C. § 848(a) during which he violated provisions of the United States Code, "including but not limited to, Sections 841, 843(b), 846, 952, and 963." The count listed chronologically thirty-six predicate acts relating to eighteen alleged smuggling events, each of which was charged as both an importation offense under 21 U.S.C. § 952 or § 963 and a possession with intent to deliver offense under 21 U.S.C. § 841(a)(1) or § 959. The indictment alleged that each crime had begun "no later than" 1988 and had continued until the date of the indictment. Based on the indictment, a United States magistrate judge issued a warrant for Valencia-Trujillo's arrest.

On January 28, 2003, the American Embassy requested that Colombia arrest Valencia-Trujillo, which it did three days later. In March 2003 the Embassy sent Diplomatic Note 449 to Colombia requesting Valencia-Trujillo's extradition. The note invoked "Article 35 of the Constitution of Colombia of 1991 as amended by the extradition reform act which entered into force on December 17, 1997, the appropriate sections of the 2000 Colombian Criminal Procedure Code, entered

4

into force on July 24, 2001, and applicable principles of international law."  As amended, Article 35 of the Colombian Constitution provides:  "Extradition can be . . . granted or offered in accordance with the public treaties or in their absence, with the law. . . . Extradition will not apply when the facts took place previous to the promulgation of this norm." Constitucion Politica de Colombia tit.1, art. 35 (1997).  That "norm" was promulgated on December 17, 1997.[1]  See id.

Mindful of that provision of the Colombian Constitution, the American Embassy stated in its diplomatic note that "each of the charges includes and is independently supported by overt acts occurring after December 17, 1997."  The Embassy then listed the information it had relating to Valencia-Trujillo's charged conduct that occurred after December 17, 1997.  That information linked Valencia-Trujillo to multi-ton seizures of cocaine from two fishing vessels and to one 300 kilogram cocaine seizure from a cargo container.  It also identified him as a leader and supplier of a cocaine-distributing network and as the head of a multi-

---

[1]  The constitutional amendment is the most recent in a series of Colombian governmental actions affecting the United States' ability to obtain extraditions from that country.  The United States and Colombia signed an extradition treaty in 1979, see Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8, which became effective three years later.  In 1986, the Colombian Supreme Court declared the law ratifying the treaty invalid.  See Judgment No. 41, 14 Jurisprudencia y Doctrina 1064 (1986). Colombia's president briefly revived extraditions by executive decree, but in 1991 the Colombian legislature amended the Colombian constitution to prohibit extradition entirely. See Gallo-Chamorro I, 48 F.3d at 503 n.1.  The 1997 Constitutional amendment discussed in the text was a response to that prohibition.

million dollar money laundering organization in New York.

Along with its extradition request the Embassy sent Valencia-Trujillo's indictment, the arrest warrant, and an affidavit from an Assistant United States Attorney explaining the legal significance of the charges. The AUSA's affidavit incorporated by reference the 139-page affidavit of FBI agent Rodrick Huff. Agent Huff's affidavit in turn detailed evidence of events occurring after December 17, 1997 that supported Valencia-Trujillo's prosecution in the United States. In February 2004 Colombia's Supreme Court of Justice advised that country's Ministry of the Interior and Justice that Valencia-Trujillo was extraditable under Colombian law for all four counts in the indictment. It stated:

> [I]n the case of granting the requested extradition, the delivery should be conditioned that Joaquin Mario Valencia-Trujillo will not be judged for actions other than those originating the claim . . .

> [T]aking into account that in [Count III] . . . there are "predicate actions" committed prior and "since or around 1997" it is indispensable that the National Government conditions the extradition [so] that he will not be judged for actions committed prior to the effective date of the Legislative Act . . . which amended article 35 of the Political Constitution, and which authorized extradition of Colombians by birth.

The Ministry of the Interior and Justice then issued Executive Resolution 24 on Colombia's behalf declaring that Valencia-Trujillo would be extradited for the

four counts in the indictment "but just for the actions performed after December 17, 1997, a date since which extradition of Colombian citizens is allowed."

While still in Colombia, Valencia-Trujillo challenged his extradition under that country's law. He asked that "he not be subject to any accusations, citations, argument, or evidence sought or introduced in reference to acts occurring before December 17, 1997." More specifically, he asked that the first twenty-six predicate acts listed in the Continuing Criminal Enterprise (CCE) count be removed and not be used to determine either his guilt or sentence because they all occurred before December 17, 1997. Valencia-Trujillo also asked Colombia to consider his objection that FBI and DEA agents had presented uncorroborated, false facts to obtain his extradition.

In a second Executive Resolution, this one being No. 37, the Ministry of the Interior and Justice denied Valencia-Trujillo's requests and "confirmed" his extradition. It "overruled" his request for the removal of all events occurring before December 17, 1997 because granting it "would involve the modification of a court order issued by a foreign authority, which would entail going beyond the scope of the extradition proceeding and interfering with the sovereignty of the country requesting extradition." Addressing Valencia-Trujillo's argument about the false statements presented in support of the extradition request, the Resolution

7

stated that those were "issues to be presented during the course of the criminal proceedings of that country, to disprove the accusations and the supporting evidence in whatever manner available the competent authorities provide for." Resolution No. 37 further stated:

> The requesting country is bound by the response given by the requested country and may try the extradited person only for those charges for which he was requested, and for those acts which took place after December 17, 1997, which are justified according to [the diplomatic note].

Valencia-Trujillo was extradited to the United States, and he initially appeared in district court in March 2004.

Before trial Valencia-Trujillo filed "Defendant's Motion to Enforce Rule of Specialty" asserting that the rule required the district court to redact from the indictment all references to events occurring before December 17, 1997 and to "bar[] the government from introducing, for any purpose, any evidence originating before that date." After hearing argument, the magistrate judge issued a Report and Recommendation which the district court adopted in its entirety despite objections by both parties. Valencia-Trujillo's motion was granted in part and denied in part.

The district court granted Valencia-Trujillo's motion to the extent that it involved redacting the first twenty-six listed predicate acts. The court also

8

indicated that it would take three other measures to prevent the jury from improperly considering evidence of events occurring before December 17, 1997. First, the jury would get a special instruction that it could not find Valencia-Trujillo guilty of any offense unless it found that the charge had been proved beyond a reasonable doubt by evidence of conduct occurring after December 17, 1997. That instruction would be given at the beginning and the end of trial. Second, the jury would get a special verdict form to ensure that any finding of guilt was consistent with the special instruction. Third, any sentence imposed on Valencia-Trujillo would be based solely on evidence of events occurring after December 17, 1997.

Beyond that, the district court denied Valencia-Trujillo's motion. It concluded that any allegation of conduct that occurred before December 17, 1997, relating to the conspiracies charged in Counts I, II, and IV, need not be redacted. The reason was that duration is not an essential element of conspiracy, as it is of a continuing criminal enterprise charge. Finally, the court made clear that its order was not intended to prevent consideration of conduct occurring before December 17, 1997 if that conduct was "relevant and otherwise admissible under the Federal Rules of Evidence." Although the government did not challenge the redaction of predicate acts 1–26, it did file a motion to reconsider the decision that it could use

only predicate acts 27–36.  The court granted the motion, confirming that the government could offer proof of uncharged acts that occurred after December 17, 1997 to the extent such evidence was otherwise admissible.  The order denying Valencia-Trujillo's rule of specialty motion noted that "the parties should raise evidentiary issues under Rule 404(b), Fed. R. Evid., or any other evidentiary rule, at the appropriate time."[2]

The jury convicted Valencia-Trujillo of all four counts of the indictment.  Using the special verdict form it had been given, the jury found that Valencia-Trujillo had committed all of the conspiracy crimes charged in Counts I, II, and IV "after December 17, 1997."  As for the CCE charge in Count III, the jury found that Valencia-Trujillo had committed twenty-two of the twenty-eight predicate acts listed on the verdict form.[3]  Six of those twenty-two predicate acts had been

_____

[2]  After his motion to enforce the rule of specialty was denied, Valencia-Trujillo filed a series of motions seeking to exclude evidence of events occurring before December 17, 1997.  Those included: a motion to reconsider the order adopting the magistrate judge's report and recommendation; a motion to prohibit reliance on uncharged predicate acts; a motion in limine; a renewed motion in limine; and a motion to strike twenty-two new predicate acts in an "unfiled" indictment.  All of those motions were denied.

[3] After the court required the redaction of the pre-December 17, 1997 predicate acts from the indictment and permitted proof of uncharged post-December 17, 1997 conduct, the government disclosed to Valencia-Trujillo an "unfiled" indictment listing the predicate acts it planned to prove at trial.  Although four of the predicate acts listed in the unfiled indictment did not appear on the special verdict form, all twenty-eight predicate acts appearing on the special verdict form were listed in the unfiled indictment.

charged in the indictment that was sent to Colombia with the extradition request. Valencia-Trujillo was sentenced to 480 months imprisonment.

## B.

Valencia-Trujillo contends that the district court violated the rule of specialty in three ways. First, he contends that the court violated it by allowing the indictment to charge three conspiracy counts that began "some time no later than 1988." He argues that the indictment should have charged only conspiracies beginning on or after December 17, 1997 and that all reference to any conduct before that date should have been redacted. Second, Valencia-Trujillo contends that the court erred by denying him the "minimum safeguard" of subjecting the evidence of events occurring before December 17, 1997 to the balancing tests of Fed.R.Evid. 403 and 404(b). Third, Valencia-Trujillo contends that the court improperly permitted the jury to consider predicate acts for the Count III CCE charge that were not included in the indictment and therefore were not covered by the extradition request sent to Colombia. Of the twenty-eight predicate acts appearing on the special verdict form, only eight were in the initial indictment sent to Colombia with the United States' extradition request.

## C.

We cannot decide the merits of Valencia-Trujillo's rule of specialty

contentions unless he has standing to assert violations of the rule in challenging his conviction. See Bochese v. Town of Ponce Inlet, 405 F.3d 964, 974 (11th Cir. 2005) ("Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims." (citations and internal quotation marks omitted)). The government's failure to raise the standing issue in the district court does not affect our duty to decide it. See id. ("Because [standing] involves the court's competency to consider a given type of case, it cannot be waived or otherwise conferred upon the court by the parties. Accordingly, we are obliged to consider questions of standing regardless of whether the parties have raised them." (citation and internal quotation marks omitted)).

Valencia-Trujillo's theory of standing is based on his assertion that he was extradited under the United States-Colombia treaty of 1979, which expressly provides for the rule of specialty. See Extradition Treaty with the Republic of Colombia, U.S.-Colom., Sept. 14, 1979, S. Treaty Doc. No. 97-8 ("A person extradited under the Treaty shall not be detained, tried, or punished in the territory of the Requesting State, for an offense other than that for which extradition has been granted . . ."). The parties agree that if Valencia-Trujillo was extradited under that treaty, he would have a private right to enforce the rule of specialty.

12

The problem for Valencia-Trujillo is that he has not established that he was extradited under a United States-Colombia extradition treaty. In asserting that he was, Valencia-Trujillo relies heavily on a 1999 State Department Memorandum from the American Embassy in Colombia to the United States Secretary of State and Department of Justice. That memorandum states that most extraditions from Colombia to the United States occur by treaty and are done according to a particular set of procedures, which include a provisional arrest followed by a request for extradition. Those procedures for the "well-established, treaty-based extradition of Colombian citizens to the United States" mirror the procedures followed during Valencia-Trujillo's extradition, including the use of the diplomatic note and the submission of affidavits by the AUSA and the case agent. Valencia-Trujillo highlights the memorandum's statement that extradition between the United States and Colombia "is governed" by the 1979 treaty, and he notes that the "meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight," see Gandara v. Bennett, 528 F.3d 823, 829 n.3 (11th Cir. 2008) (citation omitted).

Although the State Department memorandum says that it is "unlikely" that the Colombian government would use different procedures from those it describes, it does contemplate that extraditions can occur outside of the 1979 treaty. The

13

most that the State Department memorandum establishes is that extraditions from Colombia to the United States are generally governed by the 1979 extradition treaty, and that Valencia-Trujillo was extradited through procedures consistent with those used under the treaty. The memorandum does not, however, establish that Valencia-Trujillo was actually extradited under the treaty.

The diplomatic note that was sent by the American Embassy to Colombia invokes the Colombian Constitutional amendment, the Criminal Procedure Code, and applicable international law principles. It conspicuously does not invoke or even mention the 1979 Colombia-United States treaty, and Valencia-Trujillo has not pointed to any part of his extradition documents that does.[4]

Valencia-Trujillo also argues that our two Gallo Chamorro decisions establish that he was extradited under the 1979 treaty. See Gallo-Chamorro I, 48 F.3d 502; Gallo Chamorro II, 233 F.3d 1298. They do not. Those two decisions involved the extradition and conviction of a Colombian citizen for his involvement in a cocaine conspiracy. In rejecting the defendant's challenges to his convictions based on alleged violations of the rule of specialty and the

---

[4] Although the translated text of the Executive Resolution approving Valencia-Trujillo's extradition is not entirely clear, it appears to say that no agreement applies to Valencia-Trujillo's extradition. The resolution states "that because of not existing any Agreement applicable to the case it is admissible to act under provisions of the Colombian Penal Code."

principle of double criminality,[5] our opinions assumed that there was an extradition treaty between the United States and Colombia but they never identified it. Assumptions do not establish facts.

The fact is that the 1979 treaty was not in effect at the time the defendant in Gallo-Chamorro was extradited in 1990. The law ratifying the treaty had been struck down by Colombia's Supreme Court in 1986. The issuance of the executive decree in 1989 suspended Colombia's requirement that Colombian nationals be extradited only under public treaties. See Gallo-Chamorro I, 48 F.3d at 503 n.1 (quoting the decree: "for the purpose of extradition of Colombian and foreign nationals sought for [narcotics trafficking and related] offenses, the procedure set forth in the Code of Criminal Procedure shall be applied, with the modifications set forth herein."). It was the executive decree in 1989, not the 1979 treaty, that made possible Gallo-Chamorro's extradition in 1990. The Gallo-Chamorro decisions do nothing to cloud the fact that Valencia-Trujillo was not extradited under the 1979 treaty but under the Colombian Constitution and laws, as well as applicable principles of international law.

---

[5] "The doctrine of dual or double criminality is distinct from the doctrine of specialty. While specialty focuses on the conduct prosecuted, double criminality refers to the characterization of the relator's criminal conduct insofar as it constitutes an offense under the law of the respective states . . . no state shall use its process to surrender a person for conduct which it does not characterize as criminal." Gallo-Chamorro II, 233 F.3d at 1306 (citation and internal quotation marks omitted).

15

The rule of specialty applies only to extraditions pursuant to treaty. It was conceived in that context. In United States v. Rauscher, 119 U.S. 407, 7 S. Ct. 234 (1886), the second mate on an American ship had been extradited from Great Britain to the United States on a murder charge. Id. at 409–10, 7 S. Ct. at 235–36. Murder was listed as an extraditable offense in an extradition treaty between the countries. Id. at 410–11, 7 S. Ct. 236. The defendant was tried and convicted, however, on a charge of cruel and unusual punishment, which was not covered by the treaty. Id. at 409, 7 S. Ct. at 235. The Supreme Court interpreted the treaty to contain an implicit agreement that an extradited defendant would not be prosecuted for any offense not listed as an extraditable one. "[A] person who has been brought within the jurisdiction of the court, by virtue of proceedings under an extradition treaty, can only be tried for one of the offenses described in that treaty, and for the offense with which he is charged in the proceedings for his extradition." Id. at 430, 7 S. Ct. at 246.

In its analysis, the Court emphasized the importance of treaties under the United States Constitution.

> A treaty . . . is a law of the land, as an [A]ct of [C]ongress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And, when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it as it would to a

16

statute.

Id. at 240, 7 S. Ct. at 419. Because Rauscher, who had been brought under the jurisdiction of the court through an extradition treaty, was convicted of an offense that did not appear in that treaty and for which Great Britain had not granted extradition, the Court held that the trial court lacked jurisdiction to try the defendant on the unauthorized charge. Id. at 246, 7 S. Ct. at 430.

In United States v. Puentes, this Court addressed for the first time the question of whether a criminal defendant had standing to allege a violation of the rule of specialty in challenging his conviction. 50 F.3d at 1571–75. The defendant's indictment charged him with, among other things, conspiracy to import cocaine over a six-year period. Id. at 1569. A Uruguayan Court of Appeals approved the extradition request for that charge. Id. at 1570. The grand jury later returned a superseding indictment extending the conspiratorial period for the charged conspiracy by three years. Id. The defendant had been extradited under a treaty between the United States and Uruguay specifically mandating that an extradited person be tried only for the offenses for which extradition was granted. Id. at 1571. He argued that the charge in the initial indictment was different from the one for which he was actually prosecuted because the conspiratorial period had been extended by three years. On that basis, the

17

defendant raised the rule of specialty as a challenge to his conviction.  Id.

We held in Puentes that the defendant had standing to allege a rule of specialty violation but only to the extent that Uruguay had a treaty right to do so. Id. at 1572.  We explained that a country is under no legal obligation to surrender a fugitive to another country as a matter of international law.  Id.  Instead, countries broaden the reach of their criminal justice systems by entering into extradition treaties, which are cooperative agreements between two governments for the prosecution and punishment of criminals.  Those treaties typically specify the offenses for which extradition will be granted.  Id. at 1574.  When the surrendering country receives an extradition request, it may decide to grant extradition only for the offenses covered by the treaty and that is where the rule of specialty comes in.  The rule "provides the surrendering nation with a means of ensuring compliance with this aspect of the extradition treaty, and reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government."  Id. at 1572 (citation and internal quotation marks omitted).  Viewing treaties as contracts between sovereign nations, "two nations may enter into . . . an extradition contract. The doctrine of specialty is but one of the provisions of this contract."  Id. at 1574. Thus, the rule of specialty is treaty-based.  See id.; see also United States v.

18

Diwan, 864 F.2d 715, 721 (11th Cir. 1989) ("[T]he objective of the rule [of specialty] is to insure that the treaty is faithfully observed by the contracting parties.").[6]

Because extradition agreements are not treaties, they do not become part of the law of this country. See U.S. Const. art. VI., cl. 2. ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land"). And not all treaties give defendants rights that can be asserted in the courts of this country. As the Supreme Court recently explained:

> A treaty is, of course, primarily a compact between independent
> nations. It ordinarily depends for the enforcement of its provisions on

---

[6] In Gallo-Chamorro I, we considered and denied the merits of a Colombian defendant's rule of specialty claim. 48 F.3d 502, 504. Before reaching the merits we did not, however, address standing. The jurisdictional holding that the defendant had standing to raise the rule of specialty is only implicit, and for that reason is not binding under the prior panel precedent rule. Main Drug, Inc., v. Aetna U.S. Healthcare, Inc., 475 F.3d 1228, 1231 (11th Cir. 2007) ("If jurisdictional holdings are explicit they must be followed, not so if they are only implicit.").

Gallo-Chamorro II was a 28 U.S.C. § 2255 case involving a claim that the defendant's trial counsel had rendered ineffective assistance by failing to raise a dual criminality defense. 233 F.3d 1298. In the course of rejecting that claim, we assumed that extradition had been pursuant to a treaty and said that a defendant has standing to assert a violation of an extradition treaty on double criminality grounds. Id. at 1305. That assumption had no apparent factual basis and the statement is dicta because it was not in any way essential to the rejection of the ineffective assistance of counsel claim. See United States v. Eggersdorf, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997) ("The pertinent language . . . is dicta — not necessary to deciding the case then before us."); Hamilton v. Cannon, 80 F.3d 1525, 1530 (11th Cir. 1996) ("Those passages . . . are clearly dicta, because they were in no way essential to [the] holding . . . ."). The present case does not involve extradition by treaty or the dual criminality doctrine.

the interest and the honor of the governments which are parties to it. If these interests fail, its infraction becomes the subject of international negotiations and reclamations. It is obvious that with all this the judicial courts have nothing to do and can give no redress. Only if the treaty contains stipulations which are self-executing, that is, require no legislation to make them operative, will they have the force and effect of a legislative enactment.[3]

[n.3] Even when treaties are self-executing in the sense that they create federal law, the background presumption is that international agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.

Medellin v. Texas, __ U.S. __, 128 S. Ct. 1346, 1357 & n.3 (2008) (citations and internal quotations marks omitted). Unless extradition conditions or restrictions are grounded in self-executing provisions of a treaty, they do not have "the force and effect of a legislative enactment" that the defendant has standing to assert in the courts of this country.

Because Colombia's extradition of Valencia-Trujillo to the United States was not based on an extradition treaty between the two countries Valencia-Trujillo lacks standing to assert the rule of specialty.

**II.**

Valencia-Trujillo also contends that his CCE conviction should be reversed because it is tainted by a violation of the Grand Jury Clause of the Fifth Amendment. He argues that the Fifth Amendment, as interpreted in Stirone v. United States, 361 U.S. 212, 80 S. Ct. 270 (1960), requires that any substantive

20

criminal offense be included in a grand jury indictment before it can be submitted to a trial jury. According to Valencia-Trujillo, predicate acts of a CCE charge are substantive criminal offenses, which must be proved beyond a reasonable doubt to a trial jury. Most of the predicate acts presented to the trial jury in support of the CCE charge had not been submitted to the grand jury and were not included in the indictment. Forty-three months after the grand jury indictment and four months before trial, twenty-two predicate acts that were not charged by the grand jury were added in an "unfiled" indictment. Valencia-Trujillo argues that the additions violated the Grand Jury Clause of the Fifth Amendment.

Valencia-Trujillo's argument is foreclosed by our decision in United States v. Alvarez-Moreno, 874 F.2d 1402 (11th Cir. 1989). In that case the defendant's original indictment listed some acts that the government intended to use to prove the continuing series element of the CCE. See id. at 1415–16 (Clark, J, specially concurring). The issue arose when that indictment was redacted to comply with restrictions imposed by the extradition order. Id. at 1407. The redacted indictment, prepared as a formality on the last day of trial, see id. at 1416, alleged only that the defendant had imported cocaine and laundered money. Id. at 1407, 1416. The defendant argued that the redacted indictment was one predicate act short, because a CCE violation requires at least three separate predicate acts. Id. at

1408 (majority opinion). In rejecting the argument we pointed out that CCE predicate acts do not even have to be set out in the indictment. See id. ("The violations need not be charged or even set forth as predicate acts in the indictment."); id. at 1408–09 ("The law only requires evidence that the defendant committed three substantive offenses to provide the predicate for a section 848 violation, regardless of whether such offenses were charged in counts of the indictment or in separate indictments."); id. at 1409 ("If the prosecution proves an uncharged offense beyond a reasonable doubt, such offense may constitute one of the three requisite offenses sustaining a CCE charge." (citations omitted)).

Valencia-Trujillo points out that in Alvarez-Moreno the original indictment had set out all of the predicate acts that were proven at trial, so the defendant had notice of them. That distinction is, however, immaterial. Even if Valencia-Trujillo did not have notice of the twenty-two additional predicate acts at the outset of the prosecution, he did have notice of them four months before trial.

The addition of predicate acts did not prevent a meeting of the minds between the grand jury and the trial jury on the charges for which Valencia-Trujillo was convicted. The original indictment contained "including, but not limited to" language, which is broad enough to cover the predicate acts that were later added. See United States v. Moore, 149 F.3d 773, 782 (8th Cir. 1998)

22

("Given [this] broad language . . . it cannot be said that [the defendants were] convicted of a CCE charge not made in the indictment" just because the court admitted evidence of additional acts). Not only that, but the trial jury also returned a special verdict form that identified at least three predicate acts supporting the CCE charge that had also appeared in the original indictment. Valencia-Trujillo was not convicted of any crime or found guilty of any element of a crime that was not charged by the grand jury. There was no violation of the Grand Jury Clause.

## III.

Valencia-Trujillo next contends that the district court erred in denying his motion for an evidentiary hearing under Franks v. Delaware, 438 U.S. 154, 98 S. Ct. 2674 (1978), in which he sought "to invalidate his arrest and involuntary extradition on the basis of the government's violation of the Fourth and Fourteenth Amendments." He complains that the court denied him an opportunity to show that FBI Agent Huff's affidavit, which was the sole factual foundation for all documents sent to Colombia with the extradition request,[7] contained false statements that were made knowingly and intentionally or with reckless disregard

---

[7] Valencia-Trujillo asserts that Huff's affidavit provided the sole factual basis for his arrest and extradition because the conduct described in Diplomatic Note 449 corresponds precisely with the specific allegations of conduct occurring after December 17, 1997 that are outlined in Huff's affidavit and with the ten predicate acts occurring after December 17, 1997 charged by the Grand Jury in Count III.

for the truth. He also argues that Colombia extradited him with the understanding that there was sufficient evidence of conduct occurring after December 17, 1997, as the affidavit indicated, when in fact there was not enough supporting evidence without the false statements.

A Franks hearing is required when "the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." 98 S. Ct. at 155–56, 98 S.Ct. at 2676. Valencia-Trujillo was not entitled to a hearing for several reasons.

The most fundamental reason is that a criminal defendant does not have the right to challenge how he came to be within the jurisdiction of the prosecuting country. In United States v. Alvarez-Machain, the Supreme Court held that the United States had jurisdiction to try a Mexican national even though its agents had forcibly abducted him and hauled him to this country without Mexico's consent, at least where there was no treaty provision specifically prohibiting the abduction. 504 U.S. 655, 669–70, 112 S. Ct. 2188, 2196–97 (1992). It necessarily follows from Alvarez-Machain that the United States does not lose the right to prosecute a

24

foreign citizen it obtains by the lesser misconduct of an agent misrepresenting or omitting material facts in the affidavit used to secure extradition.

Further, as Valencia-Trujillo concedes, Franks has never been applied to affidavits used for the extradition of foreign citizens. We are unpersuaded by his arguments that it should be. Valencia-Trujillo says that Franks entitles a defendant who makes a "substantial preliminary showing" to an adversarial hearing where he can challenge the veracity of allegations supporting an ex parte finding of probable cause. It follows, he reasons, that because he was arrested and extradited after Colombia made an ex parte finding of probable cause based on Huff's affidavit, he is entitled to a Franks hearing concerning the statements in that affidavit.

The Fourth Amendment, however, does not apply to actions against foreign citizens on foreign soil. See United States v. Verdugo-Urquidez, 494 U.S. 259, 266, 274–75, 110 S. Ct. 1056, 1062,1066 (1990) (holding that the Fourth Amendment protects only "the people" of the United States in the context of a search of a residence of a Mexican citizen in Mexico); United States v. Emmanuel, No. 07-10378, 2009 WL 1064954 (11th Cir. April 21, 2009). Although Valencia-Trujillo argues that he is invoking application of the Fourth Amendment not in Colombia but in the United States as it relates to his

25

prosecution here, the Amendment does not work that way. The Supreme Court has explained that "a violation of the [Fourth] Amendment is 'fully accomplished' at the time of an unreasonable governmental intrusion." Verdugo-Urquidez, 494 U.S. at 264, 110 S. Ct. at 1060. Whether evidence obtained as a result of a violation of the Fourth Amendment should be excluded at trial in the United States is a "remedial question separate from the existence vel non of the constitutional violation." Id. The allegedly improper seizure of Valencia-Trujillo occurred in Colombia. Because there can be no violation of our Fourth Amendment in that country, there can be no entitlement to a Franks hearing to establish that one occurred there.

**IV.**

Valencia-Trujillo contends that the district court erred by overruling his objection under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986), to the government's peremptory strike of Julio Santos, the only Colombian-American in the sixty-three member venire. The government stated that it struck Santos based on a combination of two factors. First, Santos had family in Colombia who could have been subject to retaliation as a result of his jury service. Second, Santos had indicated on his jury questionnaire that he was "[n]ot sure" how he felt about considering the testimony of criminals who may be granted leniency in return for

26

their testimony.  The district court overruled Valencia-Trujillo's <u>Batson</u> objection orally, and then filed a written order explaining that ruling.

The Supreme Court has prescribed a three-step inquiry applicable to a defendant's challenge to a peremptory strike.  The three steps are:

> First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question.  Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.

<u>Hernandez v. New York</u>, 500 U.S. 352, 358–59, 111 S. Ct. 1859, 1866 (1991) (plurality opinion) (internal citations omitted).  Here the district court went through all three steps.  At the first step, it found that Valencia-Trujillo had failed to make a prima facie showing of discriminatory treatment.  Although the court noted that by striking Santos the government was effectively striking all Colombian-American members of the venire, it found that there was no "pattern of discrimination" against Hispanic people, noting that the government did not exercise a peremptory challenge against an Hispanic woman.  To be safe, the district court went on to consider the second and third steps anyway.

At the second step, the court decided that the two reasons the government gave for the strike were race-neutral.   With respect to the concern about Santos'

27

family in Colombia, the court emphasized the fact that throughout the investigation leading to this prosecution the government had placed over 150 people into the Witness Security Program largely because of a fear of retaliation against the family members of witnesses. The court agreed with the government that "<u>any</u> juror's relatives living in Colombia, regardless of their racial or ethnic backgrounds, would be especially susceptible to extortion, intimidation, or threats."

At the third step, the court concluded that Valencia-Trujillo did not meet his burden of showing purposeful discrimination because the persuasiveness of his objection to the strike did not outweigh the persuasiveness of the government's explanation for it. As to the first reason for the strike, the court found that the government's concern that Santos might be worried for his family if he voted to convict was "not . . . implausible." It noted that even though Santos' family lived in Bogota and Valencia-Trujillo is from Cali, the 160 kilometer distance did not remove that concern. This was especially true because Valencia-Trujillo's case involved an international organized crime enterprise, operating out of Colombia, whose members used boats, airplanes, and motor vehicles to traffic cocaine.

As to the second reason for striking Santos, the district court explained that because much of the government's case depended on the testimony of witnesses

who had been offered leniency, Santos' ambivalence toward that type of testimony could adversely affect the outcome in the case.

We doubt that Santos made out a prima facie case, but we need not dwell on that issue.[8] The district court's determination that the two proffered reasons for the strike were race-neutral clearly is correct, and its finding that the strike was not motivated by purposeful discrimination is not even close to clearly erroneous. See Wallace v. Morrison, 87 F.3d 1271, 1275 (11th Cir. 1996).

## V.

Finally, Valencia-Trujillo contends that the district court erred in denying his renewed motion for judgment of acquittal or for a new trial based on insufficiency of the evidence. We review de novo a denial of a motion for judgment of acquittal based on the sufficiency of the evidence, viewing the

---

[8] We have held that: "To ignore the prima facie showing requirement when reviewing a trial court's Batson holding would be to ignore . . . that requirement as an integral part of any Batson analysis . . . Accordingly, unless it concludes that a prima facie showing was made, an appellate court should [not] reverse a trial court's action refusing to disallow challenged strikes." United States v. Stewart, 65 F.3d 918, 925 (11th Cir. 1995). We agree, of course, that we could not reverse a district court's finding that there was no Batson violation without deciding that the defendant had made out a prima facie case, but that is not what we are doing here. We are affirming without needing to reach the prima facie case question. See United States v. Mathis, 96 F.3d 1577, 1582 (11th Cir. 1996) ("Assuming without deciding that defendant presented a prima facie case of purposeful discrimination, we hold that the district court did not err in accepting the government's race-neutral explanations and concluding that defendant had not carried his burden of proving purposeful discrimination." (internal citations omitted)).

29

evidence "in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Ortiz, 318 F.3d 1030, 1036 (11th Cir. 2003) (citation and quotation marks omitted). Valencia-Trujillo's sufficiency contention focuses on the allegations of four predicate acts relating to multi-ton cocaine seizures from two fishing vessels, the "Rebelde" and "Layney D." He puts forward three arguments.

First, Valencia-Trujillo argues that the evidence for the two Rebelde predicate acts was identical to that for the two Layney D predicate acts, yet the jury found that he had not committed those predicate acts as they related to Layney D but had committed them as they related to Rebelde. Even if true, that does not matter. See United States v. Brantley, 68 F.3d 1283, 1288 (1995) ("A defendant convicted by a jury on one count cannot attack the conviction because it was inconsistent with the verdict of acquittal on another count."); see also United States v. Powell, 469 U.S. 57, 65–66, 105 S. Ct. 471, 477 (1984). Any inconsistency in the jury's fact-findings about the commission of predicate acts for Valencia-Trujillo's CCE charge does not require that we set aside the jury verdict. In any event, there were at least three other predicate acts that he does not challenge as inconsistent, and only three are required to support the CCE conviction.

Second, Valencia-Trujillo points out that the jury had initially checked "not guilty" for the Rebelde predicate acts but then scratched it out and checked "guilty." The most likely explanations are that the jury changed its mind or the foreman mistakenly checked the wrong box and then corrected it. The change does not prove evidentiary insufficiency.

Finally, Valencia-Trujillo points out that he put into evidence handwritten notes identifying the owners of the cocaine aboard both vessels and that he was not one of them. There was, however, other evidence from which the jury could find Valencia-Trujillo responsible for the cocaine aboard those vessels. And, again, there were three other predicate acts anyway.

## VI.

Valencia-Trujillo was not railroaded but was fairly caught and convicted. He enjoyed a wild ride but was overtaken by the Panama Express, which may be his earthly version of "The Hell-Bound Train."[9]

**AFFIRMED.**

---

[9] See "The Hell-Bound Train," in 4 Ozark Folksongs, 599, 599-600 (Vance Randolph ed., 1980), available at, www.ghost-stories.net/ghost_poems/The-Hell-Bound-Train-anonymous-ghost-poem-story.htm