[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-12924

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 15, 2010
JOHN LEY
CLERK

D. C. Docket No. 07-00165-CR-T-N

UNITED STATES OF AMERICA,

                                                                Plaintiff-Appellee,

versus

ANDREAS JEJUAN SMITH,

                                                                Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(March 15, 2010)

Before HULL, WILSON and FARRIS,[*] Circuit Judges.

HULL, Circuit Judge:

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Following a jury trial, Andreas JeJuan Smith was convicted of bank robbery and being a felon in possession of a firearm. Smith appeals the bank robbery conviction and his sentence. After review and oral argument, we affirm.

## I. BACKGROUND

In August 2007, Smith was indicted for bank robbery, in violation of 18 U.S.C. § 2113(a) (Count One); using a deadly or dangerous weapon to assault law enforcement officials while they were engaged in the performance of their official duties, in violation of 18 U.S.C. § 111(b) (Count Two); using and carrying a firearm in furtherance of the assault on law enforcement officials, in violation of 18 U.S.C. § 924(c)(1)(A)(iii) (Count Three); and being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count Four). A jury convicted Smith on Counts One and Four and acquitted him on Counts Two and Three.

### A. Trial Evidence

Annette Gurley testified that on June 22, 2007, she was a bank teller at Compass Bank, a federally insured bank in Montgomery, Alabama. A man approached her window and handed her a note that read, "This is a robbery." The man stuck his hand in his pocket, said he had a weapon, and told her to open her drawer. Gurley opened her drawer and pulled out money, which included "bait

money" that had serial numbers recorded by the bank. The man placed the money in a black tube sock. When Gurley counted the money in her drawer after the robbery, she determined the man had taken $5,290.

At trial, Gurley identified Smith as the man who robbed Compass Bank. Gurley testified she was within a foot or two of Smith during the robbery. Gurley saw the right and left sides of his face, and noted there was a large bandage on his neck covering what looked like a burn. He wore a hat that obscured the top of his forehead. He looked to be in his twenties.

Four days after the robbery, Gurley thought a man working at a Hooters restaurant she was visiting resembled the robber and was staring at her. Gurley called the police, who showed her a photographic lineup that included the Hooters employee. Gurley did not identify anyone from that photographic lineup as the bank robber. On July 2, 2007, police showed Gurley another photographic lineup, and she did identify one of the men as the robber. The man she identified was Smith.

On cross-examination, Gurley admitted that when she was interviewed by police officers immediately after the robbery, she was asked whether she could identify the robber, and she said, "I think, I mean no, I couldn't, but I think so." As confirmed by the bank's security cameras, Gurley's entire encounter with the

robber lasted forty-six seconds.

Daniel Robinson testified he was working at Compass Bank when the robbery occurred. He saw an African-American man exit a black Chrysler Sebring in front of the bank and enter the bank. The man stood in line behind Robinson, who was at Gurley's window. Robinson finished talking to Gurley and returned to his office in the bank. Robinson heard a commotion, which led him to believe a robbery was occurring, and he contacted Gurley's supervisor to report the possible robbery. Robinson returned to the lobby and saw a man running out the front door. In a photographic lineup on July 2, 2007, Robinson identified Smith as the robber. However, he was not "one hundred percent" sure of his identification. Robinson characterized his degree of certainty as "closer to eighty, seventy [percent]." Because the robber pulled his hat down low, Robinson only saw the bottom part of the robber's face.

Raymond McCoy, who lived near Compass Bank, testified he saw a black Chrysler leaving the bank about the time of the robbery. He saw two African-American males in the car, which had a yellow "Support Our Troops" sticker on it.

Detective David Hill of the Montgomery Police Department testified he investigated the Compass Bank robbery. On June 29, 2007, Hill saw a car matching the description of the Compass Bank getaway car. The car Hill saw had

4

a "Support Our Troops" sticker. Hill conducted a traffic stop and discovered the car belonged to Smith's father, Glenn Teague. Hill learned that Smith also drove the car. For this reason, Hill prepared a photographic lineup that included Smith to show Gurley and Robinson. Both Gurley and Robinson had been presented with an earlier photographic lineup that did not include Smith's photograph, and neither witness identified the robber in any of the earlier-presented photographs. After Gurley and Robinson identified Smith from the photographic lineup, Hill obtained a warrant for Smith's arrest. After Smith's eventual arrest on July 20, 2007 described below, Hill saw Smith at the jail and observed that Smith had a tattoo on the left side of his neck where the bank's security video showed the bandage on the robber's neck.

John Hamilton, a deputy United States Marshal, testified that in July 2007, he was assigned, as part of a task force, to locate and arrest Smith. Hamilton testified that the Montgomery Police Department had requested help in locating and arresting Smith after Hill obtained the warrant for Smith's arrest. On July 20, 2007, at about 11:00 p.m., the task force located Smith at the home of Willie Jackson. Deputy Hamilton, along with a fellow task force member, Officer Duane Richardson, conducted a "knock and talk" at Jackson's house. Smith, whom Deputy Hamilton recognized from photographs, opened the door partway. Deputy

5

Hamilton identified himself as a United States Marshal and told Smith to come out. Smith quickly closed the door, and Deputy Hamilton tried unsuccessfully to kick the door open. Officer Richardson succeeded in kicking the door open. At that point, two shots were fired through the door. Deputy Hamilton heard the two rounds, but did not see anything except for two holes that appeared in the door and the doorjamb.

Deputy Hamilton ran to the back of the house, where another member of the task force, Deputy United States Marshal Ted Williams, was waiting. Deputy Hamilton entered through a back door and saw Jackson lying on a sofa, another man – Jamaal Clark – in the corner, and Smith running towards the back of the house. As Smith ran, he threw a semiautomatic handgun onto the floor. Deputy Hamilton caught Smith and handcuffed him.

In a safety sweep of the house, the task force members found a rifle on the floor next to the sofa, the semiautomatic handgun – a .40 caliber Smith and Wesson – on the floor, and a rifle upstairs. Two spent .40 caliber shell casings were found in the kitchen. Deputy Hamilton testified he never saw Jackson or Clark with a gun in their hands. Deputy Hamilton never saw who fired the shots but, based on his training and what he saw and heard that night, he believed "[w]ithout a doubt" that Smith was the one who shot at him.

6

Clark testified he was in the bathroom when Hamilton and Richardson knocked on the door. As he left the bathroom, he saw Smith standing at the door holding a handgun. Clark went to the back of the house, and was in the room with Jackson, when he heard two or three gunshots. Clark stated that neither he nor Jackson fired the shots, but he could not see Smith at the time.

Jackson testified that when Hamilton and Richardson knocked on the door, Smith went to the door while holding a pistol. Jackson heard the door open, shut, and lock, then he heard two shots fired. Jackson did not see who was shooting. He did see Clark when the shots were fired, and Clark was not holding a gun. Jackson denied firing at the marshals. Jackson had a telephone conversation with Smith in August 2007 in which Smith told Jackson that they needed to tell the police that Clark shot the gun. However, Jackson knew Clark did not shoot at the marshals.

Katherine Richert, a forensic scientist with the Alabama Department of Forensic Sciences specializing in firearms and tool mark identification, testified that she analyzed the pistol and two shell casings recovered from the Jackson house. Richert concluded the shell casings were fired from the pistol. Deputy United States Marshal James Austin testified that the two rifles recovered from Jackson house were loaded, but not fired, on the night of July 20, 2007.[1]

_____

[1]The parties stipulated that the .40 caliber Smith and Wesson pistol found at Jackson's house traveled in and affected interstate commerce. The government submitted certified copies

7

At the close of the government's case, Defendant Smith moved for a judgment of acquittal on all counts. As to the bank robbery charge, Smith argued that Gurley initially mis-identified another man – the Hooters employee – as the robber, and that Robinson only saw part of the robber's face and was not totally certain of his identification of Smith in the photographic lineup. The district court denied Smith's motion as to all counts.

Smith testified in his own defense. Smith suggested that his father – Teague – robbed Compass Bank.[2] Smith stated that although he answered the door at Jackson's house on July 20, 2007, he did not have a gun on him at the time, that the .40 caliber pistol was Clark's, and that Clark was the one who fired the gun. Smith testified that he was trying to close the door, and one of the marshals was trying to force it open, when Clark fired the shots. Then Smith got the door closed and ran toward the back of the house, where he saw Clark wipe down the gun and put it on a table.

Defendant Smith also called Hercules Walker, a friend of Smith's and Clark's, who testified he visited Jackson's home regularly, including on the

of two felony convictions against Smith for receiving stolen property.

[2]Defendant Smith called Teague as part of his case. Teague admitted he had a prior conviction for robbery, for which he spent more than twenty years in prison, that he never met Smith until Smith was about twenty-four years old, and that he frequented the Compass Bank that was robbed. Teague testified he was in Florida when the robbery occurred.

afternoon of July 20, 2007. Walker examined a photograph of the .40 caliber Smith and Wesson pistol recovered by United States Marshals and testified it looked identical to one he saw Clark with when he would visit Jackson's house. Walker had never seen Smith with this gun. Walker also saw Clark selling marijuana at Jackson's home on or around July 20, 2007. When Clark sold marijuana, he carried the gun with him when he answered the door.

Dr. Solomon Fulero testified as an expert witness for Smith. Dr. Fulero testified about the reliability of eyewitness testimony and memory. Dr. Fulero noted factors that lessen the reliability of eyewitness identification, including the passage of time, stress, and cross-racial identification.

At the close of his case, Defendant Smith renewed his motion for a judgment of acquittal, and the district court denied it. As noted, the jury found him guilty on Counts One and Four (bank robbery and being a felon in possession of a firearm), and acquitted him of Counts Two and Three (shooting at federal officers and using a firearm in an assault on federal officers).

## B. Sentence Recommendations and Objections

The probation office prepared a presentence investigation report ("PSI"). For the firearm possession count (Count Four), the PSI recommended a base offense level of 33 and a total offense level of 39. The PSI noted that the base

offense level for firearm possession is governed by § 2K2.1 of the advisory sentencing guidelines. Although § 2K2.1(a) sets the base offense level for firearm possession by a prohibited person, § 2K2.1(c)(1)(A) states that if "the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense," § 2X1.1, governing attempt, solicitation, or conspiracy, should apply if the resulting offense level is greater than the base offense level under § 2K2.1(a). U.S.S.G. § 2K2.1(c)(1)(A) (2007). Section 2X1.1(a) provides that the base offense level is the base offense level from the substantive offense that was attempted, solicited, or the object of a conspiracy. The PSI recommended that, based on the shooting at the United States Marshals, the appropriate substantive offense was first-degree attempted murder, which pursuant to U.S.S.G. § 2A2.1(a)(1) has a base offense level of 33. After applying a six-level enhancement for obstruction of justice, based on Smith's assault of the marshals, the PSI recommended a total offense level of 39. Because the offense level for the firearm conviction was higher than that for the bank robbery conviction, the PSI recommended that it govern Smith's sentence. See U.S.S.G. ch. 3, pt. D, introductory cmt. (2009) (stating that, when finding advisory guidelines range for independent instances of assault or robbery, one should "start with the offense level for the most serious count and use the number and severity

10

of additional counts to determine the amount by which to increase that offense level").[3]

The PSI calculated that Smith had nine criminal history points, yielding a criminal history category of IV. Smith's total offense level of 39 and his criminal history category of IV yielded an advisory guidelines range of 360 months' to life imprisonment. The PSI noted, however, that the statutory maximum for Smith's bank robbery conviction was 240 months, and the statutory maximum for the firearm possession conviction was 120 months, pursuant to 18 U.S.C. §§ 924(a)(2), 2113(a).

Smith objected to the PSI's enhancement of his offense level for the firearm conviction based on conduct (the shooting) for which he was acquitted. The government sought an additional six-level "official victim" enhancement under U.S.S.G. § 3A1.2(c)(1) because the shooting at the time of Smith's arrest involved law enforcement officers, plus a two-level obstruction of justice enhancement pursuant to § 3C1.1 because Smith asked Jackson to lie about who fired the shots at the marshals.

---

[3]For the bank robbery count, the PSI recommended a base offense level of 20, pursuant to U.S.S.G. § 2B3.1(a), a two-level increase under § 2B3.1(b)(1) because property of a financial institution was taken, and a two-level increase under § 2B3.1(b)(2)(F) because a threat of death was made during the robbery when Smith told Gurley he had a weapon. Thus, the PSI recommended a total offense level of 24 for the bank robbery conviction. Because the total offense level for the bank robbery conviction was more than eight levels less than the firearm possession offense level, under § 3D1.4(c) Smith did not receive a multi-count adjustment.

After holding an initial hearing on the sentencing issues, the district court issued a written opinion on the parties' objections to the PSI. As to the enhancement of the firearm offense level based on acquitted shooting conduct under § 2K2.1(c)(1)(A), the district court concluded that: (1) Smith's arguments that considering the acquitted conduct violated his Fifth and Sixth Amendment rights were foreclosed by Eleventh Circuit precedent; (2) the government proved by a preponderance of the evidence that Smith fired the shots at the door when the marshals tried to enter Jackson's house; (3) the shooting was relevant to the firearm possession conviction because the trial evidence showed Smith possessed the gun only on the evening of his arrest, and thus Smith shot at the marshals during his commission of the offense of conviction; and (4) Smith's shooting at the marshals did not amount to attempted first-degree murder, as the government argued, but instead amounted to attempted second-degree murder. The district court also concluded that both the six-level official victim enhancement and the two-level obstruction of justice enhancement were appropriate.

Smith filed a pro se objection to the PSI's inclusion of his juvenile conviction under Alabama's Youthful Offender Act in its calculation of his criminal history points. The government conceded Smith should not have received the three points in his criminal history calculation arising from that conviction, and

12

the district court sustained this objection.

The probation office amended the PSI to reflect the district court's rulings. On the firearm possession conviction, the amended PSI recommended a base offense level of 27, pursuant to U.S.S.G. § 2A2.1(a)(2), governing second-degree murder. It applied the six-level official victim enhancement and the two-level obstruction of justice enhancements, for a total offense level of 35. The amended PSI re-calculated Smith's criminal history points, yielding a new criminal history category of III. Smith's total offense level of 35 and criminal history category of III yielded an advisory guidelines range of 210 to 262 months' imprisonment.

## C.    Second Sentencing Hearing

The district court held a second sentencing hearing. The probation officer and the government recommended a sentence at the high end of the guidelines range: a statutory maximum sentence of 240 months' imprisonment on the bank robbery conviction and a consecutive 22 months' imprisonment on the firearm possession conviction. Smith requested a downward variance. Smith contended he was sentenced based on conduct for which he was acquitted at trial, namely assaulting United States Marshals with a firearm. He argued that, absent that conduct, his advisory guidelines range would be 63 to 78 months' imprisonment,

13

and he requested a sentence in that range.[4]

The district court found that Smith's total offense level was 35 and his criminal history category was III, yielding an advisory guidelines range of 210 to 262 months' imprisonment. But the district court found that a downward variance was justified, and it sentenced Smith to 153 months' imprisonment on the bank robbery conviction and 120 months' imprisonment on the firearm possession conviction, with the terms of imprisonment to run concurrently. The district court explained that the 153-month sentence was midway between the high end of the pre-enhancement range, 97 months, and the low end of the post-enhancement range, 210 months.

In a separate written order, the district court explained that its decision to grant a downward variance arose from a concern "that the weight of the evidence [of Smith's shooting at the marshals] was not sufficient to support so dramatic an increase" in his advisory guidelines range. The district court expressly stated that its variance was based on consideration of the 18 U.S.C. § 3553(a) factors that the sentence imposed should reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, protect the public from further

---

[4]The district court stated that, absent a consideration of the acquitted conduct, Smith's advisory guidelines range would have been 78 to 97 months. In his brief on appeal, Smith agrees with this figure.

crimes by the defendant, and provide deterrence.

Smith appealed. The government did not appeal.

## II. DISCUSSION

On appeal Smith challenges both the sufficiency of the evidence supporting his bank robbery conviction and the district court's consideration of acquitted conduct in imposing his sentence.

### A. Sufficiency of Evidence

Smith argues the government did not provide sufficient evidence to convict him of bank robbery. He contends there was no physical evidence and the testimony of the government's two eyewitnesses to the robbery, Gurley and Robinson, was unreliable because: (1) Gurley gave conflicting descriptions of the robber, initially told police she could not identify the robber, and falsely identified the Hooters employee as the robber;[5] and (2) Robinson did not positively identify Smith in a photographic lineup, but only suggested that a picture of Smith looked like the robber.[6]

"We review de novo a denial of a motion for judgment of acquittal based on the sufficiency of the evidence, viewing the evidence in the light most favorable to

---

[5]Gurley actually testified that although she thought the Hooters employee resembled the man who robbed the bank, she never positively identified him as the robber.

[6]Smith also argues that Teague's testimony was unreliable, but the government did not call Teague. Teague was Smith's witness.

the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Valencia-Trujillo, 573 F.3d 1171, 1185 (11th Cir. 2009) cert. denied, __ S. Ct. __, 2010 WL 333757 (Mar. 1, 2010) (quotation marks omitted). We leave credibility determinations to the jury unless the testimony is "incredible as a matter of law." United States v. Flores, 572 F.3d 1254, 1263 (11th Cir.), cert. denied, 130 S. Ct. 568 (2009). To be "incredible as a matter of law," testimony must relate "to facts that the witness could not have possibly observed or events that could not have occurred under the laws of nature." Id. (quotation marks omitted).

Gurley and Robinson both observed the robber at the time of the offense, and both later identified Smith in photographic lineups. Their testimony was not incredible as a matter of law. In fact, it was supported by the fact that Smith's father owned a car matching the description of the one used by the robber, and that the robber had a bandage on the left side of his neck in the same location as Smith's tattoo. The jury was fully aware of the potential problems with eyewitness identification and was instructed by the district court to consider that when deciding on a verdict. Additionally, the government presented the bank surveillance video that showed the person who robbed the bank, and the jury was free to view Smith in the courtroom and compare his appearance with the person

16

shown in the video while evaluating the witnesses' credibility. The district court

did not err in finding there was sufficient evidence to support Smith's bank robbery

conviction.

**B.    Sentencing**

Smith raises a number of arguments against the use of acquitted conduct –

his shooting at the United States Marshals, which the district court found by a

preponderance of the evidence had occurred – in calculating and imposing his

sentence.[7]

Under the advisory guidelines, offense conduct and adjustments may be

based on "all acts and omissions committed . . . by the defendant . . . during the

commission of the offense of conviction, in preparation for that offense, or in the

course of attempting to avoid detection or responsibility for that offense."

U.S.S.G. § 1B1.3(a)(1)(A), (B). Both the Supreme Court and this Court have

approved the use of acquitted conduct to enhance a defendant's sentence. See, e.g.,

United States v. Watts, 519 U.S. 148, 154, 117 S. Ct. 633, 636 (1997) (approving

use of acquitted conduct in sentencing as relevant conduct under § 1B1.3, and

stating that "sentencing enhancements do not punish a defendant for crimes of

---

[7]We review the district court's interpretation and application of the sentencing guidelines de novo, and its fact findings for clear error. United States v. Foley, 508 F.3d 627, 632 (11th Cir. 2007). We review constitutional challenges to a sentence de novo. United States v. Lyons, 403 F.3d 1248, 1250 (11th Cir. 2005).

17

which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction" (citing <u>Witte v. United States</u>, 515 U.S. 389, 402-03, 115 S. Ct. 2199, 2207-08 (1995)); <u>United States v. Jennings</u>, 991 F.2d 725, 733 (11th Cir. 1991) (explaining that § 1B1.3 relevant conduct "includes evidence of the defendant's conduct relating to counts on which the defendant was indicted but acquitted at trial" (quotation marks omitted)).

In the wake of <u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738 (2005), however, we have acknowledged limits on a district court's ability to consider acquitted conduct in imposing a sentence. <u>United States v. Campbell</u>, 491 F.3d 1306, 1314 (11th Cir. 2007); <u>see</u> <u>United States v. Duncan</u>, 400 F.3d 1297, 1304 (11th Cir. 2005) ("<u>Booker</u> does not suggest that the consideration of acquitted conduct violates the Sixth Amendment <u>as long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict</u>." (emphasis added)). Smith raises several arguments that the district court exceeded those limits here.

First, Smith acknowledges that the United States Supreme Court has approved the use of acquitted conduct to enhance a defendant's sentence where the acquitted conduct concerns the manner in which the defendant committed the crime of conviction, citing <u>Watts</u>, 519 U.S. 148, 117 S. Ct. 633, and <u>Witte</u>, 515 U.S. 389, 115 S. Ct. 2199. He argues, however, that the sentence enhancements

18

were inappropriate here because the acquitted conduct was neither part of nor committed during the convicted offense. Even assuming Smith's narrow reading of Watts and Witte is correct, Smith's argument fails. That is because, contrary to Smith's assertions, his sentence was enhanced based on acquitted conduct that did occur during a convicted offense.

Smith contends he was convicted of bank robbery and of being a felon in possession of a firearm during the bank robbery, while the assault on the marshals occurred a month later. That is not the case. The jury found Smith guilty on Count Four of the indictment, which charged Smith possessed a loaded .40 caliber Smith & Wesson handgun "[o]n or about July 20, 2007" – the date of the shooting at the marshals. And the evidence at trial as to Smith's possession of a firearm related only to the day of his arrest. No one testified that Smith had a gun when he robbed Compass Bank, only that he stuck his hand in his pocket and claimed to have a weapon. On the contrary, Deputy Hamilton, and Clark and Jackson (who were in the house), all testified that Smith had a gun when the marshals came to Jackson's house to arrest Smith. Thus, Smith's firearm conviction related to conduct on July 20, 2007, not during the bank robbery. Consequently, Smith's shooting at the marshals occurred during a convicted offense.

Second, Smith argues that the district court's use of acquitted conduct to

enhance his sentence violated a number of his rights under the Fifth and Sixth

Amendments – namely, due process, the protection against double jeopardy, and

the rights to a jury trial and to compel and confront witnesses. Smith cites no

binding precedent supporting his arguments, and we reject them. Here the

acquitted conduct was proved by a preponderance of the evidence, the district court

clearly treated the guidelines as advisory (indeed, the district court varied

downward from the advisory guidelines range), and the sentence imposed did not

exceed the statutory maximum sentence authorized by the jury verdict. See, e.g.,

United States v. Faust, 456 F.3d 1342, 1348 (11th Cir. 2006) ("[U]nder an advisory

Guidelines scheme, courts can continue to consider relevant acquitted conduct so

long as the facts underlying the conduct are proved by a preponderance of the

evidence and the sentence imposed does not exceed the maximum sentence

authorized by the jury verdict."). We find no constitutional violation here.[8]

Finally, Smith argues his sentence is substantively unreasonable.[9] We

---

[8]Smith makes a related argument that the use of acquitted conduct to enhance his sentence undermines the role of the jury. We disagree. "[A]n acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." Campbell, 491 F.3d at 1317 n.14 (brackets in original).

[9]Smith's brief does not actually use the term "substantively unreasonable." What he actually argues is that he received "a clearly excessive and inappropriate sentence that runs counter to the factors for sentencing laid out in 18 U.S.C. § 3553." He contends that the sentence necessary to punish him in light of the § 3553(a) factors was no more than 78 to 97 months' imprisonment, which would have been his sentencing range without considering acquitted conduct. This argument is, in effect, a substantive unreasonableness argument.

review the reasonableness of the sentence imposed for abuse of discretion. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). The sentence must be substantively reasonable under the totality of the circumstances. Id. at 1191. The party challenging the sentence bears the burden to show it is unreasonable in light of the record and the § 3553(a) factors. United States v. Thomas, 446 F.3d 1348, 1351 (11th Cir. 2006).

Smith has not met his burden. In sentencing Smith, the district court expressly considered, among other things, the seriousness of the offense conduct and the needs for deterrence and to protect the public from further crimes by Smith. Although Smith was acquitted of shooting at the marshals who came to arrest him for bank robbery, there was substantial evidence that he in fact did so, and the district court found that this evidence satisfied the preponderance of the evidence standard (a finding Smith does not challenge on appeal). Nevertheless, the district court varied downward from the advisory guidelines range – the 153-month sentence the district court imposed was 57 months below the bottom of Smith's advisory guidelines range of 210 to 262 months. That the sentence was above another potential sentencing range that did not apply to Smith does not make it unreasonable. Under the totality of the circumstances, we cannot say Smith's

21

sentence is substantively unreasonable.[10]

### III.  CONCLUSION

For the reasons set forth above, we affirm Smith's bank robbery conviction and his sentence.

**AFFIRMED.**

---

[10]In addition, Smith has not shown there was any procedural error or other error in the guidelines calculations and thus has not shown his sentence is procedurally unreasonable.