[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-13433

_____

D.C. Docket No. 0:11-cv-60955-JIC


CARLOS ALBERTO YACAMAN MEZA,

Petitioner - Appellant,

versus

U.S. ATTORNEY GENERAL,
UNITED STATES DEPARTMENT
OF JUSTICE,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 6, 2012)

Before WILSON, PRYOR, and MARTIN, Circuit Judges.

PRYOR, Circuit Judge:

This appeal involves the constitutional separation of powers and the limited

judicial role in the extradition of a foreign national. Carlos Alberto Yacaman Meza, a Honduran national, appeals the denial of his petition for a writ of habeas corpus. See 28 U.S.C. § 2241 (2006). The Republic of Honduras requested, under the United States-Honduras Extradition Treaty of 1909, that the United States extradite Yacaman for prosecution on the charge of murder of a fellow Honduran national, Luis Rolando Valenzuela Ulloa. At the request of the United States, a magistrate judge held an extradition hearing and issued a certification of extraditability for Yacaman. See 18 U.S.C. § 3184 (2006). Witnesses to the alleged murder averred, without dispute, that Yacaman shot Valenzuela at a restaurant for his refusal to deliver on a bribe for government contracts. Yacaman then filed a petition for a writ of habeas corpus to block his extradition, but the district court denied that petition. On appeal, Yacaman contends that the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment bars his extradition by the Secretary of State, that the murder of Valenzuela constitutes a political offense for which he cannot be extradited, and that there is no valid extradition treaty in force between Honduras and the United States. Yacaman's first argument is not ripe because the Secretary of State has not yet determined whether he is likely to be tortured nor decided whether to extradite him, and his other arguments lack merit. We vacate in part

2

and affirm in part the denial of Yacaman's petition for a writ of habeas corpus, lift the stay of the extradition proceedings, and remand with instructions to dismiss Yacaman's claim under the Convention Against Torture.

## I. BACKGROUND

An expert witness proffered by Yacaman explained, in the proceeding before the magistrate judge, that in 2005 Valenzuela helped Jose Manuel Zelaya ascend to the presidency by raising money for Zelaya's campaign. Valenzuela promised donors like Yacaman that they would receive a place in the Zelaya administration in exchange for political donations. Zelaya won the election and appointed Valenzuela to serve as a minister in his cabinet.

In June 2009, Zelaya's efforts to amend the Honduran Constitution to permit him to seek another presidential term precipitated a coup d'état. In the early morning hours of June 28, 2009, the Honduran military assailed the presidential palace and forced Zelaya, who was still in his pajamas, onto an airplane bound for Costa Rica. Later that day, the Honduran Congress voted Zelaya out of office and installed Roberto Micheletti, the Speaker of Congress, as Interim President.

After the coup, numerous protests broke out. There were "days and week[s] of demonstrations . . . [and] violence, [and] some killings in the streets as the

3

military attempted to reestablish order." The estimates of deaths ranged "anywhere from several hundred to a couple thousand people."

The United States and the Organization of American States brokered an agreement to stop the violence. The Honduran government agreed to hold elections monitored by international observers and promised to allow Zelaya to return to Honduras. Initially, Zelaya's supporters—known as La Resistancia—opposed the elections, but eventually La Resistancia negotiated with the probable successor of Micheletti, Porfirio Lobo. The mass protests and demonstrations "began to decline," and Lobo was elected President in November 2009.

In June 2010, there was "considerable public denunciation" of Lobo because he had not helped Zelaya return to Honduras. Members of La Resistancia, including Valenzuela, challenged President Lobo in an atmosphere of "open antagonism" and "friction." At least a dozen journalists were assassinated. But as the summer progressed, "calmer heads prevailed," and more members of La Resistancia began to negotiate with the Lobo government.

Nevertheless, in 2010, Honduras remained a "violent and highly dangerous country." The presence of drug traffickers and corrupt military groups accounted for much of the violence. Institutional corruption continued unabated, and the

4

Honduran authorities failed to protect government officials and civilians from violent retribution.

Zelaya's former minister, Valenzuela, was shot and killed while he dined at a restaurant in Honduras one year after the coup. The Honduran government interviewed witnesses to the murder, concluded that Yacaman shot Valenzuela, and obtained an arrest warrant from a Honduran judge. We rely on one of the witness's sworn accounts to describe the facts of the murder. We assume the facts are true because Yacaman does not contest them.

On the evening of June 15, 2010, Yacaman approached Valenzuela at his table at Feocarril Restaurant. Yacaman told Valenzuela's companions that the former minister was a "scoundrel" and a "thief" who had robbed Yacaman's factory of 10 million lempiras. Yacaman complained that Valenzuela had promised Yacaman "several [government] projects" in exchange for Yacaman's campaign donations to Zelaya, but that Valenzuela never gave him any projects and ignored his requests to return his money.

In response, Valenzuela told Yacaman that he was "messing with the wrong person" and that he planned "to talk to [his] people." Valenzuela started to make telephone calls, and Yacaman exclaimed, "So now you want to kill me? . . . . [Y]ou robbed my money and now you want to kill me." Yacaman once again told

5

Valenzuela's companions that the former minister had "betrayed" him by reneging

on a promise to award him government projects:

> [T]he thing is that [Valenzuela] betrayed me, he was going to give me
> several projects that I would direct, but he never gave me nothing[.]  I
> have asked him to return my money in different ways, he never takes my
> calls, he changed his cell phone number and I am tired of asking him to
> return what he robbed from me.

Yacaman returned to his table, but he later approached Valenzuela again.

Yacaman exclaimed, "Look Roland . . . you are going to pay me, you are going to

pay me, you . . . son of a bitch . . . you already have been mourned in life, you are

a dead man."  As Valenzuela turned to leave the restaurant, Yacaman shot him in

the neck.

Yacaman fled.  He entered the United States, and on September 10, 2010,

Immigration and Customs Enforcement detained him in Miami, Florida.

At the request of the Honduran government, the United States filed a

complaint for the extradition of Yacaman, under the 1909 Extradition Treaty

between the United States and Honduras, as modified by the 1927 Supplementary

Extradition Convention.  The complaint alleged that Honduran authorities had

charged Yacaman with murder, that the homicide took place in Honduras, and that

a Honduran judge had issued a warrant for Yacaman's arrest.  In a memorandum

in support of its complaint, the government explained that an extradition

certification "is in order" when the court has the power to conduct the extradition proceeding; the court has jurisdiction over the fugitive; the applicable treaty is in full force and effect; the crimes for which surrender is requested are covered by the applicable treaty; and there exists sufficient evidence to support a finding of probable cause as to each charge for which extradition is sought.  The government asserted that, under the rule of judicial non-inquiry and by federal statute, 18 U.S.C. § 3186 (2006), the Secretary of State has the sole discretion to consider whether a request for extradition should be denied on humanitarian grounds.  The government attached the sworn declaration of an attorney adviser in the Office of the Legal Adviser for the Department of State who attested that, in accordance with the extradition treaty, which was in "full force and effect," the Embassy of Honduras had submitted a diplomatic note which requested Yacaman's extradition, and the request related a charge covered by the extradition treaty.

Yacaman opposed the request for his extradition on three grounds.  First, Yacaman argued that the murder of Valenzuela constituted a political offense and that the extradition treaty expressly excluded crimes of a political nature as a basis for extradition.  Second, he asserted that the magistrate judge lacked the authority to order his extradition because there was no valid extradition agreement between Honduras and the United States.  Third, he asserted that the Honduran government

7

could not guarantee his safety if he were returned to Honduras.

After hearing argument from both sides and from an expert witness proffered by Yacaman, the magistrate judge entered a certification of extraditability and an order of commitment directed to the United States Department of State. The magistrate judge concluded that the certification was in order and that the murder "was not political in nature, since the offense occurred well after the coup in Honduras and was not incidental to it." The magistrate judge refused to consider whether to deny the extradition on humanitarian grounds because the Secretary of State had the sole discretion to make that decision.

Yacaman moved the magistrate judge to stay the issuance of the certification of extraditability. The magistrate judge agreed to stay the issuance of the certification three times, and after the last 90 day period ended, the judge sent a certified copy of the certification to the Department of State.

On May 2, 2010, Yacaman filed a petition for a writ of habeas corpus, 28 U.S.C. § 2241, and challenged the magistrate judge's authority to certify him as extraditable. Yacaman raised the same defenses against extradition as he had previously raised and added that the Convention Against Torture, as implemented by the Foreign Affairs Reform and Restructuring Act, prohibited his extradition because the evidence at the extradition hearing allegedly proved that Honduran

8

prison officials would acquiesce to his torture in prison. The government reiterated that it would not attempt to rebut any evidence that Yacaman would be tortured or killed in Honduras because the Secretary of State has the sole discretion to deny an extradition request on humanitarian grounds.

The district court denied Yacaman's petition. The court concluded that the murder of Valenzuela was not a political offense because "the crime was one borne of avarice and revenge, rather than politics." As to the validity of the treaty, the district court concluded that it would not question the executive's declaration that a valid treaty remained in force. The district court also agreed with the government that it had no authority to consider Yacaman's argument about the Convention Against Torture because it could only review whether the magistrate judge had jurisdiction; whether the offense charged is within the treaty; and whether there was reasonable ground to believe that Yacaman was guilty of the extraditable offense.

Yacaman timely appealed and moved to stay the extradition proceedings, pending the resolution of this appeal. We granted a stay of the proceedings. There is nothing in the record to suggest that the Secretary has decided to comply with the extradition request, and at oral argument, neither party disputed that the Secretary had not yet decided whether to surrender Yacaman to Honduran

9

officials.

## II. STANDARDS OF REVIEW

Several standards of review govern this appeal.  "We review de novo questions concerning our subject matter jurisdiction, including . . . ripeness." Elend v. Basham, 471 F.3d 1199, 1204 (11th Cir. 2006).  "On review of a denial of a habeas petition regarding the issuance of a certification of extraditability, we review factual findings for clear error and questions of law de novo."  Noriega v. Pastrana, 564 F.3d 1290, 1294 (11th Cir. 2009).  The political offense extradition question presents "a question of mixed law and fact, but chiefly of fact."  Ornelas v. Ruiz, 161 U.S. 502, 509, 16 S. Ct. 689, 691 (1896).  "[W]e must grant a magistrate's factual findings great deference and affirm the decision unless it is 'palpably erroneous in law' and a reasonable factfinder would have had 'no choice' but to conclude that the offender was acting in furtherance of a political uprising."  Ordinola v. Hackman, 478 F.3d 588, 598 (4th Cir. 2007) (quoting Ornelas, 161 U.S. at 509, 511, 16 S. Ct. at 692).

## III. DISCUSSION

We divide our discussion in three parts.  First, we discuss whether Yacaman's argument that his extradition would violate the Convention Against Torture is justiciable.  Second, we discuss whether the extradition treaty between

10

the United States and Honduras remains in force.  Third, we discuss whether the murder of Valenzuela is a political offense.

### A. Yacaman's Claim That His Extradition Will Violate His Rights Under the Convention Against Torture is Not Ripe.

Yacaman and the government disagree about whether we may review the Secretary's decision to extradite Yacaman.  Yacaman urges us to conclude that he will be tortured in Honduran prison and that the Convention Against Torture bars his extradition.  The government directs our attention to the judicial rule of non-inquiry, which ordinarily "precludes [judges] from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request."  Martin v. Warden, Atlanta Pen, 993 F.2d 824, 829 (11th Cir. 1993).

Although the argument that we may not second-guess the Secretary's determination than an extraditee will not be tortured has considerable force, see Trinidad y Garcia v. Thomas, 683 F.3d 952, 957 (9th Cir. 2012); Omar v. McHugh, 646 F.3d 13, 24 (D.C. Cir. 2011); cf. Mironescu v. Costner, 480 F.3d 664, 672–73 (4th Cir. 2007), we need not reach this issue.  There is nothing in the record to suggest that the Secretary has decided whether to surrender Yacaman.  Yacaman's claim about torture is not ripe.

"Article III requires us to determine in every appeal whether an appellant

11

presents a case or controversy . . . ,” United States v. Rivera, 613 F.3d 1046, 1049 (11th Cir. 2010), and “[t]he ripeness doctrine keeps federal courts from deciding cases prematurely,” id. at 1050 (internal quotation marks omitted).  The ripeness doctrine protects federal courts “from engaging in speculation or wasting their resources through the review of potential or abstract disputes.”  Id. (internal quotation marks omitted).  This doctrine “is necessary to maintain the separation of powers that is a central feature of the Constitution.”  Id. at 1049.

Yacaman’s argument that the Convention Against Torture bars his extradition “is not ripe for adjudication . . . [because] it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.” Texas v. United States, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259 (1998) (internal quotation marks omitted).  Yacaman assumes that the Secretary will surrender him to Honduran officials, but there is no evidence in the record that the Secretary has decided to comply with the extradition request.  She may find that Yacaman is more likely than not to be tortured in Honduras and refuse to surrender him.  See 22 C.F.R. § 95.2(b) (2011).  Or she may find that Yacaman is less likely than not to be tortured and choose to extradite him.  See id.  Or she may decide to extradite Yacaman even if she decides he will be tortured.  Cf. 18 U.S.C. § 3186.  Or she may decide that Yacaman will not face torture, but decide not to comply with the

12

extradition request for other reasons. Cf. id. In the light of these different possibilities, only one thing is certain: Yacaman has "ask[ed] us to resolve [his] dispute prematurely." Rivera, 613 F.3d at 1050.

The decision of the Ninth Circuit in Cornejo-Barreto v. Seifert is instructive. See Cornejo-Barreto, 218 F.3d 1004 (9th Cir. 2000), overruled on other grounds by Garcia, 683 F.3d at 957. In that decision, an extraditee asserted that the Convention Against Torture barred his extradition because he faced torture upon surrender. See id. at 1007–08. The Ninth Circuit held that his defense was not ripe because the Secretary had yet to decide whether to surrender him. Id. at 1016. We agree with the Ninth Circuit that, until the Secretary decides to surrender him, Yacaman's claim that he should not be extradited based on the Convention Against Torture is not ripe for our review. See id.

This ripeness concern does not bar our consideration of Yacaman's other arguments. As our precedents make clear, a magistrate judge decides, in the first instance, and a district court decides on collateral review, whether an extradition treaty exists or whether a crime is a political offense, and we review the decision of the district court. See, e.g., Kastnerova v. United States, 365 F.3d 980, 985–87 (11th Cir. 2004) (considering whether a valid extradition treaty existed); Escobedo v. United States, 623 F.2d 1098, 1104 (5th Cir. 1980) (considering

13

whether a crime was a political offense).  In contrast, the Secretary decides, at least in the first instance, whether to refuse extradition on humanitarian grounds after she receives the certification of extradition from the magistrate judge.  See Martin, 993 F.2d at 830 ("Martin should direct his argument that extradition is unjust . . . on humanitarian grounds to the Executive Branch.  The Secretary of State will, ultimately, determine whether Martin should be surrendered pursuant to the Extradition Treaty.").  We vacate in part, lift the stay of the extradition proceedings, and remand with instructions to dismiss Yacaman's claim under the Convention against Torture.  We leave for perhaps another day whether the rule of non-inquiry would bar judicial review of the Secretary's decision.

### B. There is a Valid Extradition Treaty in Force Between the United States and Honduras.

Yacaman argues that the district court erred in denying his petition because there is not a valid extradition treaty between the United States and Honduras under which he can be extradited.  He asserts that, between the June 2009 coup d'état and the election of President Lobo in early 2010, an illegitimate government ruled Honduras.  Yacaman contends that the government failed to prove that Lobo's government was a "successor state" entitled to assume the obligations under the extradition treaty previously adopted by a "legitimate" Honduran

14

government.

Yacaman's argument fails for two independent reasons.  First, we defer to the executive in determining whether an extradition treaty remains in force.  Second, the concept of successor state—which is central to Yacaman's argument—has no application in this appeal.  We address both of these reasons in turn.

We must defer to the determination of the executive branch that the treaty between Honduras and the United States remains in force.  "[T]he question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial, and . . . the courts ought not to interfere with the conclusions of the political department in that regard."  Terlinden v. Ames, 184 U.S. 270, 288, 22 S. Ct. 484, 491 (1902).  We and "every other Court of Appeals to consider whether a treaty has lapsed ha[ve] deferred to the Executive's determination."  Kastnerova, 365 F.3d at 986; see, e.g., United States ex rel. Saroop v. Garcia, 109 F.3d 165, 171 (3d Cir. 1997); Then v. Melendez, 92 F.3d 851, 854 (9th Cir. 1996); N.Y. Chinese TV Programs, Inc. v. U.E. Enters., Inc., 954 F.2d 847, 852 (2d Cir. 1992); Sabatier v. Dabrowski, 586 F.2d 866, 868 (1st Cir. 1978).  Because a member of the executive branch attested that an extradition treaty remains in force between the United States and Honduras, we decline to

15

hold the treaty invalid.

And the successor-state analysis, which would require us to consider whether the conduct of two nations evinces an intent to be bound by a preexisting treaty, has no application in this appeal. That analysis applies only when a nation, such as Czechoslovakia, splinters into other nations, such as the Czech Republic and Slovakia. See, e.g., Kastnerova, 365 F.3d at 985–86 (holding that the conduct of the United States and the Czech Republic evinced an intent to be bound by an extradition treaty between the United States and Czechoslovakia). But unlike the Czech Republic, Honduras is not a successor-state; Honduras experienced only a change of administration.

*C. The Murder of Valenzuela is Not a Political Offense.*

Yacaman also argues that the district court erred when it denied his petition because the extradition treaty bars extradition "for any crime or offense of a political character." He contends that the "violent uprising that peaked with the coup d'etat was in full force when Valenzuela was killed" and that several political observers, including Zelaya, view the killing as politically motivated. We reject this argument and conclude that the political offense exemption from extradition does not apply.

"Traditionally, there have been two categories of political offenses: 'pure'

16

and 'relative.'" Ordinola, 478 F.3d at 596. "Pure" political offenses include treason, sedition, and espionage. Id.; see also Vo v. Benov, 447 F.3d 1235, 1241 (9th Cir. 2006). "Relative" political offenses include "common crimes that are so intertwined with a political act that the offense itself becomes a political one." Ordinola, 478 F.3d at 596. Because murder is not a pure political offense, our determination of whether the political exemption applies turns on whether the murder of Valenzuela qualifies as a relative political offense.

To qualify as a relative political offense, the murder of Valenzuela "must [have] involve[d] an 'uprising' or some other violent political disturbance" and the murder "must have been incidental to the" alleged uprising or disturbance. Garcia-Guillern v. United States, 450 F.2d 1189, 1192 (5th Cir. 1971); Escobedo, 623 F.2d at 1104. Examples of an uprising or violent political disturbance include "war, revolution and rebellion." Escobedo, 623 F.2d at 1104 (internal citations omitted). And crimes "incidental to" war, revolution, or rebellion do not include "common crimes connected but tenuously to a political disturbance, as distinguished from criminal acts 'causally or ideologically related to [an] uprising.'" Koskotas v. Roche, 931 F.2d 169, 171–72 (1st Cir. 1991) (quoting Quinn v. Robinson, 783 F.2d 776, 809 (9th Cir. 1986) (alteration in original).

Yacaman's alleged crime does not qualify as a relative political offense

17

because Valenzuela was not murdered in the course of any uprising or violent political disturbance. To be sure, the 2009 coup d'état was a violent political disturbance. But Valenzuela was murdered one year after the military toppled Zelaya, and even Yacaman's expert conceded that the violence had abated significantly since Zelaya's fall from power.

The district court did not err when it sustained the magistrate judge's finding that the murder of Valenzuela was not political in nature. Avarice and revenge motivated Yacaman to murder Valenzuela, and Yacaman neither had "an intention to promote violent political change nor an intention to repress violent political opposition." Koskotas, 931 F.2d at 172. Yacaman killed Valenzuela for failing to honor his end of a bribe. As the government states, "[t]he root of the dispute may have been a political contribution, but the motive for the homicide clearly was personal and not political." Moreover, even if he had been subjectively politically motivated, "[a]n offense is not of a political character simply because it was politically motivated." Escobedo, 623 F.2d at 1104. The crime also has to be "causally or ideologically related to the uprising," Quinn, 783 F.2d at 809, and the murder of Valenzuela was neither. See Escobedo, 623 F.2d at 1104 (holding that the kidnaping of a Cuban consul for the alleged purpose of ransoming political prisoners in Cuba was not a "political offense" because the

18

crime was not "committed in the course of and incidental to a violent political disturbance"); Garcia-Guillern, 450 F.2d at 1192 (holding that financial crimes by a Peruvian public official are not political offenses).

The First Circuit in Koskotas drew the same kind of distinction between an ordinary crime related to politics and a political offense. In that decision, the fugitive had been charged with funneling embezzled money to Greek government officials in return for political favors, and the scandal resulted in the ouster of the Greek Prime Minister and the controlling political party. Koskotas, 931 F.2d at 170–71. The fugitive argued that the political offense exemption should apply because Greece was in the midst of a violent "constitutional revolt" and his alleged financial crimes were part of the effort to eliminate political opposition to the controlling party. Id. at 172. The First Circuit rejected this argument and concluded that the fugitive had "distort[ed] both the relevant Greek political landscape and the purpose of the 'political offense' exception, by characterizing as a violent uprising what plainly [was] an electoral conflict tainted by allegations of political corruption." Id. The court concluded too that it was "[s]ignificant[]" that the fugitive neither had "an intention to promote violent political change nor an intention to repress violent political opposition." Id. We do not believe that this appeal is materially different from Koskotas, and the reasoning of our sister circuit

19

is persuasive.

## IV. CONCLUSION

We vacate in part and affirm in part the denial of Yacaman's petition for a writ of habeas corpus, lift the stay of the extradition proceedings, and remand with instructions to dismiss Yacaman's claim under the Convention Against Torture.

**VACATED IN PART AND AFFIRMED IN PART; STAY LIFTED; AND REMANDED.**