[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14328

_____

D.C. Docket No. 1:17-cv-23938-JLK

ANDRES FELIPE ARIAS LEIVA,

Petitioner-Appellant,

versus

WARDEN, et al.,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 8, 2019)

Before MARCUS, GRANT, and HULL, Circuit Judges.

GRANT, Circuit Judge:

The Colombian Supreme Court convicted Andres Arias Leiva of committing

two crimes while he served as the country's Minister of Agriculture. Although

Arias[1] attended his trial, he did not wait for the verdict; having anticipated a politically motivated conviction, Arias left for the United States, where he has lived ever since.  Now Colombia wants him back.  The United States plans to honor that request and extradite Arias under a treaty that the two countries signed in 1979.  But while in prison pending his surrender to Colombia, Arias filed a petition for a writ of habeas corpus to block his extradition.  The district court denied that petition.

Now on appeal, Arias's chief argument is that the United States cannot extradite him under the Extradition Treaty because it is not in effect.  Arias is right that, in 1986, the Colombian Supreme Court nullified the domestic legislation that ratified the treaty and that as a result Colombia no longer relies on the treaty when sending fugitives to the United States.  But the frailty in his argument is that our Executive Branch—not Arias and not this Court—gets to decide what impact, if any, the Colombian court's ruling had on the treaty's status as between the parties.  And, according to the Department of State, both countries continue to recognize the compact as valid and in force.  Under the separation of powers established in and demanded by our Constitution, the Judicial Branch cannot second-guess that political judgment call or indulge whatever our own views on the matter may be.  We therefore affirm the district court's denial of Arias's petition for a writ of habeas corpus.

---

[1] We refer to the petitioner as "Arias" because that is the name he chose to use in his briefing.

2

I.

A.

First, the facts.  Arias served as Minister of Agriculture in President Alvaro Uribe's administration from 2005 to 2009.  During that time, he ran a development program known as Agro Ingreso Seguro (AIS), which sought to modernize Colombia's irrigation system by providing subsidies to farmers.  In support of that goal, the Ministry entered into three contracts with an organization called the Inter-American Institute for Cooperation on Agriculture (IICA)—although the point of that partnership remains in dispute.  According to Arias, the Ministry sought the IICA's help with implementing scientific and technical endeavors; the current Colombian government claims that the IICA merely administered the program's funds.  In any event, no one disputes that the program disbursed funds worth millions of dollars to Colombian farmers, making Arias one of the administration's most popular cabinet members.

In 2009, Arias resigned his post so that he could run for the presidency after Uribe's final term.  He campaigned for his party's nomination against another former cabinet member, Juan Manuel Santos, who had served in the Uribe administration as Minister of Defense.  Despite an early lead in the polls, Arias faltered after certain news reports accused him of diverting AIS funds to wealthy landowners in return for political patronage.  Arias claims that Santos fueled these reports through his family-owned media outlets, which succeeded in boosting Santos's political standing.  In the end, Arias lost the nomination to Santos, who

won the general election and took office in 2010.  From then on, Arias remained a prominent and vocal critic of the incoming government.

In 2011, the new administration's Attorney General charged Arias with two crimes based on his implementation of the irrigation subsidies program: (1) Conclusion of Contract Without Fulfilling Legal Requirements and (2) Embezzlement for Third Parties.  For the first crime, the Colombian government alleged that Arias falsely designated contracts as "scientific and technical" in order to bypass a public bidding process.  Colombian law normally requires government agencies to award contracts based on public bids but exempts projects that call for scientific and technical expertise.  In those situations, the agency can negotiate directly with a given contractor from the start.  According to the Colombian government, Arias abused this carveout to fast-track the subsidy program and ensure that his preferred contractor, the IICA, managed the process.

Next, the Colombian government claimed that Arias funneled millions in program subsidies to eleven families even though he knew that they did not qualify.  He purportedly allowed these select applicants to subvert the grant process by "subdividing" their farms and submitting duplicate applications so that they could obtain more benefits than they deserved—that is, multiple subsidies for what had been a single property.  In the Colombian government's telling, Arias knew about and sanctioned these illegal allotments to curry political favor in advance of his presidential run.

Arias was tried in the Colombian Supreme Court starting in June 2012.  His trial lasted nearly two years and involved 57 witnesses, including the defendant

4

himself.  Arias, represented by counsel, disputed both charges.  He argued, among other things, that the Ministry's contracts complied with the relevant procurement laws and that he had no hand in third-party attempts to manipulate the subsidy grant process.  The court ultimately rejected those defenses, finding that Arias knowingly violated the public bidding requirement and actively facilitated the diversion of government funds.

Before the court could render that decision, however, Arias—fearing that he would be convicted as a political target—left the country.  Given their rivalrous history, Arias had begun to suspect that President Santos had rigged the result of the trial to silence his political foe.  To that end, Arias reached out to an American diplomat, who he claims helped pave the way for him to enter the United States.  Arias arrived in this country in June of 2014.  After he was followed by his wife and two children, he filed a petition for asylum—a petition that, to this day, remains pending.  About one month later, the Colombian Supreme Court convicted Arias in absentia and sentenced him to 17 years in prison.  Shortly following the conviction, Colombia asked the United States to extradite Arias so that he could "serve the sentence."

### B.

In response to Colombia's request, the United States filed a complaint for extradition in the district court under 18 U.S.C. § 3184.  That statute authorizes a magistrate judge to certify an extradition charge when "there is a treaty or convention for extradition" and the magistrate judge "deems the evidence sufficient to sustain the charge under the provisions of the proper treaty."  18

5

U.S.C. § 3184.  The United States invoked the Extradition Treaty that it signed with Colombia in 1979 and ratified in 1982.  *See* Extradition Treaty Between the United States of America and the Republic of Colombia, Colom.-U.S., Sept. 14, 1979, S. Treaty Doc. No. 97-8 (1981).  Following a hearing, the magistrate judge issued an "Extradition Certification and Order of Commitment" which in turn authorized the government to detain Arias pending his surrender to Colombia.

Once a magistrate judge certifies an extradition, as happened here, extradition targets do not have the benefit of a direct appeal.  *See Martin v. Warden, Atlanta Pen.*, 993 F.2d 824, 827 n.3 (11th Cir. 1993).  Fugitives detained in the United States can, however, obtain "limited" collateral review "by means of a petition for writ of habeas corpus," which is what Arias sought in the district court below.  *Noriega v. Pastrana*, 564 F.3d 1290, 1295 (11th Cir. 2009).  But even then, the habeas procedure "is not a means for rehearing the magistrate's findings."  *Afanasjev v. Hurlburt*, 418 F.3d 1159, 1163 (11th Cir. 2005) (quoting *Escobedo v. United States*, 623 F.2d 1098, 1101 (5th Cir. 1980)).  Instead, the district court reviews extradition orders to determine only (1) "whether the magistrate had jurisdiction," (2) "whether the offense charged is within the treaty," and (3) "whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."  *Martin*, 993 F.2d at 828 (quoting *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)).

Given those limits, the "scope of habeas corpus review of a magistrate's order of extradition is quite narrow."  *Hill v. United States*, 737 F.2d 950, 951 n.1 (11th Cir. 1984) (per curiam); *see also Afanasjev*, 418 F.3d at 1163 ("This Court

6

has repeatedly noted 'that a district court's [habeas] review of a magistrate judge's issuance of a certificate of extraditability is narrow.'" (quoting *Kastnerova v. United States*, 365 F.3d 980, 984 (11th Cir. 2004))).  Like the magistrate judge, district courts cannot "inquire into the guilt or innocence of the accused." *Kastnerova*, 365 F.3d at 987; *see also Noeller v. Wojdylo*, 922 F.3d 797, 803–04 (7th Cir. 2019) ("A United States court dealing with an extradition request for an accused is obliged to resist any temptation to judge the guilt or innocence of the accused.").  Nor can they let policy judgments come into play; those determinations remain "an Executive function."  *Martin*, 993 F.2d at 829.

In the face of these limitations, Arias argued to the district court that the magistrate judge lacked jurisdiction at the outset because the Treaty is not in force. The United States pointed out in response that the Treaty took effect on March 4, 1982, when the parties exchanged instruments of ratification.  Arias nonetheless relied on a 1986 ruling by the Colombian Supreme Court, which found that the Colombian law ratifying the Treaty was unconstitutional—specifically, that the legislation had been signed by a government official other than the Colombian President.  Arias also claimed that his alleged conduct would not violate United States law and that the Treaty restricts extraditable offenses to those that are punishable in both countries.  Finally, he insisted that his conviction does not constitute competent evidence to sustain the extradition charge because it was rendered by a corrupt and biased court.

As for the United States, the Department of State's Assistant Legal Adviser for Law Enforcement and Intelligence, Tom Heinemann, filed a declaration

confirming that the official position of the United States is that the Extradition Treaty remains valid and in effect. Mr. Heinemann also submitted a diplomatic note from the Colombian government stating its own view that the Treaty "continues currently in force." The district court deferred to the Executive's judgment that the Treaty remains in force and thus moved past the jurisdictional phase of its inquiry.

Next, the district court concluded that the charged crimes—namely, the diversion of government subsidies and the knowingly false designations of government contracts—would violate our federal law if indeed they were committed, and therefore qualified as extraditable offenses. The district court also declined to delve into the asserted bias and corruption of the Colombian Supreme Court, cautioning that only the Executive Branch can properly evaluate the fairness of Colombia's judicial system in deciding whether to grant extradition.

## II.

Arias has appealed those determinations. "On review of a denial of a habeas petition regarding the issuance of a certification of extraditability, we review factual findings for clear error and questions of law de novo." *Meza v. U.S. Att'y Gen.*, 693 F.3d 1350, 1356 (11th Cir. 2012) (quoting *Noriega*, 564 F.3d at 1294). Because we review only the district court's order, the scope of our analysis "is similarly restricted." *Martin*, 993 F.2d at 828. Yet once we complete our "limited inquiry," that is not the end of the road, at least as far as the extradition target is concerned. *Id.* at 829. The Secretary of State retains the final call on "whether to issue a warrant of surrender," after the courts complete our habeas review. *Id.*

8

And, in reaching that final decision, he "may properly consider myriad factors affecting both the individual defendant as well as foreign relations"—which the Judicial Branch may not. *Id.* Once made, the Secretary's decision "is not generally reviewable by the courts." *Id.* (citing *Escobedo*, 623 F.2d at 1105).

## III.

### A.

We have long observed that the judicial role is narrow when it comes to treaty recognition and matters of extradition. *See, e.g.*, *Meza*, 693 F.3d at 1353 (recognizing "the limited judicial role in the extradition of a foreign national"); *Kastnerova*, 365 F.3d at 986 (observing that "every other Court of Appeals to consider whether a treaty has lapsed has deferred to the Executive's determination" (collecting cases)). Courts lack the authority—not to mention the expertise—to dispute the wisdom of these political judgments, even when reasonable minds might disagree about the costs and consequences. The Executive Branch, by contrast, is "well situated" to weigh the "sensitive foreign policy issues" inherent in this sphere—and, we would add, politically accountable in a way that the courts are not. *Munaf v. Geren*, 553 U.S. 674, 702 (2008). Our review in this case must continue to respect the structural boundaries set out between these roles.

The necessity of this deferential approach is inherent in the Constitution's text and design—in particular, in its allocation of powers. Article II states that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." U.S. Const. art. II, § 2, cl. 2. This language—known as the Treaty Clause—vests exclusive

authority over treaty formation in the political branches.  Article III, which establishes the federal judicial power, extends that power to cases "arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority."  U.S. Const. art. III, § 2, cl. 1.  But "this passage does not speak to whether the court's jurisdiction extends to challenges to the treaty-making procedures employed by Congress and the President."  *Made in the USA Found. v. United States*, 242 F.3d 1300, 1305 n.11 (11th Cir. 2001).  And the power to interpret a treaty does not obviously include the predicate question of whether to recognize a treaty in the first instance.

Based on those distinct textual commitments, the Supreme Court long ago held that deciding whether a foreign power had authority to ratify a treaty involves "political questions" that "belong exclusively to the political department of the government."  *Doe v. Braden*, 57 U.S. (16 How.) 635, 657 (1853).  In that case, one party disputed that the King of Spain had authority, under Spanish law, to ratify the treaty ceding Florida to the United States.  *Id.*  The Court declined to second-guess the Executive's determination, as "it would be impossible for the executive department" to make treaties "if every court in the country was authorized to inquire and decide whether the person who ratified the treaty on behalf of a foreign nation had the power" to do so.  *Id.*

The Supreme Court fortified that view nearly 50 years later when it deferred to the Executive's position that an extradition treaty between the United States and Prussia remained valid following the formation of the German Empire.  *See Terlinden v. Ames*, 184 U.S. 270, 288 (1902) (discussing *Braden* with approval).

10

In so doing, the Court reemphasized that "the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial." *Id.* Accordingly, "courts ought not to interfere with the conclusions of the political department in that regard." *Id.*

Lower courts have followed that directive in deferring to the Executive Branch's position regarding treaty recognition. *See, e.g.*, *Meza*, 693 F.3d at 1358 (citing *Terlinden*, 184 U.S. at 288); *Noriega*, 564 F.3d at 1294–95 (same); *Kastnerova*, 365 F.3d at 986 (same); *New York Chinese TV Programs, Inc. v. U.E. Enters., Inc.*, 954 F.2d 847, 852 (2d Cir. 1992) (The "judiciary should refrain from determining whether a treaty has lapsed, and instead should defer to the wishes of the elected branches of government."). And as we have specifically recognized, courts "*must* defer to the determination of the executive branch" in deciding whether an extradition treaty remains in force. *Meza*, 693 F.3d at 1358 (emphasis added). In keeping with that conclusion, we held in *Meza* that the extradition treaty between the United States and Honduras remained valid because "a member of the executive branch attested" to that effect. *Id.* Here too, Mr. Heinemann's declaration set forth the United States Executive Branch's position—that the Treaty remains in full force.

We therefore have no answer but this: the Treaty remains in effect. That means, in turn, that the United States can rely on it when extraditing fugitives to Colombia. And although Arias rightly notes that federal law requires "a treaty or convention for extradition," 18 U.S.C. § 3184, he is wrong when he asserts that none exists here. His mistaken view hinges largely on a 1986 ruling by the

11

Colombian Supreme Court, which declared unconstitutional the Colombian law that ratified the Treaty because it was signed by the wrong government official.[2] Arias emphasizes that the Treaty, by its terms, was "subject to ratification" and would only "enter into force on the date of the exchange of the instruments of ratification." Extradition Treaty, Colom.-U.S., *supra*, art. 21, S. Treaty Doc. No. 97-8, at 8. But that is exactly the point—both countries ratified the Treaty by 1982 and exchanged instruments of ratification that same year.

Arias, however, seems to reason that the 1986 ruling retroactively cancelled the effect of that ratification and exchange between the parties. But both signatories continue to officially recognize the Treaty—notwithstanding the Colombian Supreme Court's ruling that the Colombian official who ratified the Treaty lacked the power to act in that capacity. *Cf. Braden*, 57 U.S. at 657 (declining to second-guess the Executive's judgment that "the person who ratified the treaty on behalf of a foreign nation had the power, by its constitution and laws, to make the engagements into which he entered"). In fact, although both Colombia and the United States remain free to terminate the Treaty "at any time by giving notice to the other Party," neither nation has ever done so. Extradition Treaty, Colom.-U.S., *supra*, art. 21, S. Treaty Doc. No. 97-8, at 8.

The Colombian Supreme Court's 1986 ruling does not demand—or, more fundamentally, allow—a different result. According to the governments of the

---

[2] Specifically, the Colombian law was signed by a Senior Minister of the government to whom the Colombian President had delegated various executive functions while the President was out of the country. *See* Igor I. Kavass, *Colombia: Supreme Court Decision on Law Concerning the Extradition Treaty Between Colombia and the United States*, 27 Int'l Legal Materials 492, 495 (1988).

12

United States and Colombia, that domestic ruling limited the manner in which *the Colombian government* can extradite individuals to the United States.  But it did not impact the United States' ability to extradite fugitives under the Treaty.  The Department of State's legal adviser, for his part, acknowledged that the ruling may have had an effect "under the internal law of Colombia," but emphasized that "the United States has never considered that the Colombian court's decisions had the effect of terminating or suspending the operation of the Treaty."  And the Colombian government likewise asserted that the ruling was "exclusively of internal nature" and did "not affect" the Treaty's validity as a matter of international law.

We are loath to override the position of the United States on matters of extradition, which, after all, "is an executive function derived from the President's power to conduct foreign affairs."  *Noriega*, 564 F.3d at 1294 (citing *Martin*, 993 F.2d at 828); *see also Terlinden*, 184 U.S. at 289.  Substituting our judgment for that of the Treaty partners regarding the scope and effect of this foreign court ruling would surely overstep our "limited role."  *Noriega*, 564 F.3d at 1294 (citing *Martin*, 993 F.2d at 828 n.6).  As the Supreme Court has explained, the "decisions of the Executive Department in matters of extradition, within its own sphere, and in accordance with the Constitution, are not open to judicial revision."  *Terlinden*, 184 U.S. at 290.

To be clear, we are deferring to the Executive's judgment on a *political issue*—that is, treaty recognition.  We need not ponder the outer bounds of that deference, if any, when it comes to *historical facts* surrounding treaty formation

13

and termination.  Here, the parties do not question what the Treaty says.  Nor do they dispute what the Colombian Supreme Court ruled.  Their disagreement centers on the impact that the Columbia ruling had on the Treaty's ongoing validity, but that determination is simply "not judicial."  *Braden*, 57 U.S. at 657.  It belongs to the Executive Branch alone.  *See Terlinden*, 184 U.S. at 288; *Meza*, 693 F.3d at 1358.

Of course, courts retain an independent duty to interpret treaties— extradition or otherwise—just as they do for any statute, Constitutional provision, or other source of law.  *See, e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992) ("In construing a treaty, as in construing a statute, we first look to its terms to determine its meaning."); *Yapp v. Reno*, 26 F.3d 1562, 1565 (11th Cir. 1994) ("Deciding this case . . . also requires us to interpret the meaning of the lapse of time provision of the 1931 Extradition Treaty.").  But there is a critical difference between the power "to construe a treaty" and the power "to make" one. *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821) (Story, J.).  Disavowing this Treaty based on the Colombian Supreme Court's ruling would be an exercise of power that "belongs by the [C]onstitution to another department of the Government," rather than "an exercise of judicial functions."  *Id.*  That type of decision depends on politically sensitive and discretionary judgments that we are not well-equipped to assess.  The President, by contrast, "is authorized to appoint ambassadors, other public ministers and consuls, and to receive them from foreign nations; and is thereby enabled to obtain accurate information of the political condition of the nation with which he treats."  *Braden*, 57 U.S. at 657.

14

Given these understandings about the division of authority and expertise between the executive and judicial branches, we must be careful to "observe the line between treaty interpretation on the one hand and negotiation, proposal and advice and consent and ratification on the other." *Franklin Mint Corp. v. Trans World Airlines, Inc.*, 690 F.2d 303, 311 (2d Cir. 1982). On matters of construction, courts have the final word; the views of the Executive, while important, are "not conclusive." *Factor v. Laubenheimer*, 290 U.S. 276, 295 (1933). On matters of recognition, by contrast, we defer to the Executive's authority to make treaties and conduct our foreign affairs. *See, e.g.*, *Terlinden*, 184 U.S. at 288; *Braden*, 57 U.S. at 657.

None of Arias's arguments against this constitutional deference succeeds. *First*, Arias claims that we should consider the Treaty valid only if the signatory nations act like it is; instead of listening to what they say, we should look at what they do. On that score, Arias claims that Colombia has not invoked the Treaty when processing extradition requests made by the United States since the 1986 ruling. To back up this assertion, he also cites the Supreme Court's decision in *Terlinden* and our decision in *Kastnerova*, which, to be fair, both analyzed country conduct in determining whether a given treaty remained in force. Still, neither of those cases requires—or, again, even allows—undertaking that kind of analysis here.

We will concede some tension. In *Terlinden*, the Supreme Court did state that when deciding whether an extradition treaty has been terminated, "governmental action in respect to it must be regarded as of controlling

15

importance."  184 U.S. at 285.  Even so, the Court relied on country conduct only insofar as it showed that the German Empire "officially recognized" and could therefore invoke the treaty between its predecessor—Prussia—and the United States.  *Id.* at 286.  Moreover, the *Terlinden* Court still solidly rejected the very scenario advocated by Arias: the notion that a foreign fugitive—like Arias—could "call on the courts of this country" to second-guess his nation's official stance was declared "out of the question," especially considering that the United States government had accepted the German government's view.  *Id.*

Here, we need not scrutinize Colombia's conduct because we already know its official position, which the Department of State has accepted and likewise endorsed—that the treaty is in force between the two countries.  Moreover, no one asserts that Colombia is seeking to invoke a predecessor government's treaty with the United States, as was the case for the German Empire in *Terlinden*.  And in any event, *Terlinden*'s consideration of the would-be foreign signatory's behavior came alongside the Supreme Court's numerous statements regarding the inherent authority of the Executive Branch over the issue of treaty recognition.  *See, e.g.*, *Terlinden*, 184 U.S. at 288 ("We concur in the view that the question whether power remains in a foreign State to carry out its treaty obligations is in its nature political and not judicial."); *id.* at 289 (explaining that the power to extradite "is clearly included within the treaty-making power" and "is devolved on the Executive authority.").

Similarly, in *Kastnerova*, this Court analyzed whether an extradition treaty with the former Czechoslovakia remained in force between the United States and

16

the newly formed Czech Republic. *See* 365 F.3d at 985–87. In doing so, we reviewed the "conduct" of both countries, including the exchange of diplomatic letters and the fact that the Czech Republic sought extraditions under the treaty. *Id.* at 986. That discussion, however, merely bolstered the conclusion that the treaty was intact; it did not amount to a holding that courts *must* consider past practices. *See id.* at 986–87. Regardless, we have expressly limited *Kastnerova*'s conduct-based analysis to "successor-state" scenarios in which one country "splinters into other nations," and the court is called to consider whether a new nation has invoked its predecessor's treaty. *Meza*, 693 F.3d at 1358.[3]

Moreover, even if Colombia's alleged conduct violated the Treaty, a violation would not render the Treaty itself *invalid*. Nor would it give us license to reach that conclusion. As the Supreme Court explained in the *Head Money Cases*, a "treaty is primarily a compact between independent nations," and so the remedy for its infraction depends on how "the injured party chooses to seek redress." 112 U.S. 580, 598 (1884). It is "obvious that with all this the judicial courts have nothing to do." *Id.* The Judicial Branch has obeyed this rejoinder. In *Charlton v. Kelly*, for example, the Court specifically rejected the contention that Italy's refusal to comply with an extradition treaty meant that it "ceased to be of obligation on the United States." 229 U.S. 447, 469 (1913). Italy's conduct made the treaty "only

---

[3] Arias also cites *Blake v. Am. Airlines, Inc.*, 245 F.3d 1213 (11th Cir. 2001), in passing. That decision is even less relevant because no one in that case questioned the ongoing validity of the treaty at issue. Both the parties and this Court agreed that the relevant compact—the Warsaw Convention—was in force; we addressed only whether Jamaica remained a party to it. *Id.* at 1215–16. And in answering that question, we could not defer to the Executive's view because the United States had "taken no position" on the issue. *Id.* at 1216.

17

voidable, not void." *Id.* at 473. And in *Terlinden*, the Supreme Court explained that when one party violates a treaty, "it rests alone with the injured party to pronounce it broken." 184 U.S. at 287. Here, notwithstanding any alleged violation of the Treaty by Colombia, the United States has never pronounced it void or otherwise renounced the extradition agreement at all. *See Escobedo*, 623 F.2d at 1107 n.27 ("Even if the claimed lack of reciprocity were construed to be a violation of treaty obligations, it would be for the Executive alone to determine whether to waive such violations or to renounce the extradition agreement." (citation omitted)).

*Second*, Arias asserts that our own precedent requires us to find that Colombia's conduct has invalidated the Treaty, regardless of what we might conclude on a fresh look at the question. To support this contention, he cites *United States v. Gallo-Chamorro*, 48 F.3d 502 (11th Cir. 1995); *United States v. Duarte-Acero*, 296 F.3d 1277 (11th Cir. 2002); and *United States v. Valencia-Trujillo*, 573 F.3d 1171 (11th Cir. 2009). It is true that in those cases we stated, in one way or another, that the Colombian Supreme Court's 1986 ruling had an impact on the Treaty—at least as it applies in Colombia. For example, in *Gallo-Chamorro*, we acknowledged the ruling and explained that, as a result, "the treaty remains inapplicable in Colombia." 48 F.3d at 503 n.1. In *Duarte-Acero*, we similarly observed that the Colombian Supreme Court had "annulled the extradition treaty altogether, finding its ratification unconstitutional." 296 F.3d at 1279. And in *Valencia-Trujillo*, we explained that Colombia chose to extradite the

18

defendant under its domestic laws given that the Treaty "was not in effect at the time." 573 F.3d at 1179.

Setting aside that at least two of these cases—*Gallo-Chamorro* and *Duarte-Acero*—mentioned this issue only in dicta, these decisions do not control the outcome here because they only describe the Treaty's operation *in Colombia*. Indeed, all three opinions involve Colombia's ability, under Colombian law, to rely on the Treaty when extraditing fugitives to the United States. *See Gallo-Chamorro*, 48 F.3d at 503 (observing that "the Colombian government by resolution extradited the Defendant to the United States"); *Duarte-Acero*, 296 F.3d at 1279 (explaining that "the *Corte Suprema de Justical*, Colombia's highest court, denied the request to extradite Duarte"); *Valencia-Trujillo*, 573 F.3d at 1181 (finding that "Colombia's extradition of Valencia-Trujillo to the United States was not based on an extradition treaty"). Even *Valencia-Trujillo* went only so far as to say that the fugitive in that case could not enforce the Treaty's protections, seeing as he "was not extradited under" it. 573 F.3d at 1179. We explained that because the "law ratifying the treaty had been struck down by Colombia's Supreme Court in 1986," Colombia had to process the fugitive's extradition "under the Colombian Constitution and laws" instead. *Id.* We had no occasion to discuss the authority of the *United States*, under United States law, to invoke the Treaty when extraditing fugitives to Colombia. Accordingly, nothing in our prior opinions gives us reason to doubt that authority here or otherwise binds us to a different outcome than the one we reach today.

19

*Third*, Arias insists that magistrate judges exercise Article III power in extradition proceedings and therefore cannot defer to the Executive because doing so would abdicate the judicial role. The government counters that extradition proceedings "do not arise under Article III." And, in fact, courts differ on this point. *Compare DeSilva v. DiLeonardi*, 125 F.3d 1110, 1113 (7th Cir. 1997) (finding that "the proceeding before the magistrate judge was an Article III case or controversy"), *with Lo Duca v. United States*, 93 F.3d 1100, 1108 (2d Cir. 1996) (holding that "extradition officers do not exercise judicial power under Article III"). We have not staked out a definitive position, remarking only that an "extradition proceeding is not an ordinary Article III case or controversy," but one in which "the judiciary serves an independent review function delegated to it by the Executive and defined by statute." *Martin*, 993 F.2d at 828.

But this issue is largely academic for our purposes. Whether or not magistrate judges exercise Article III power in extradition proceedings, they do not violate judicial authority by deferring to the Executive on matters of treaty recognition. The same holds true for this Court and the district court below, which assuredly act in Article III capacities in habeas proceedings. *Cf. DeSilva*, 125 F.3d at 1113 ("The current proceeding—the quest for writs of habeas corpus—is anything but advisory."). Although the "transfer of the judicial power to an executive agency" would raise "constitutional concerns," *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1213 (2015) (Thomas, J., concurring), the key point here is that treaty recognition is not a judicial power in the first instance; it is a political one. *See* U.S. Const. art. II, § 2, cl. 2; *supra*, at 14–15. Arias's separation of

20

powers argument thus gets things exactly backwards: it is one thing to cede judicial powers, quite another to usurp political ones.  By deferring to the Executive in this context, courts do not run afoul of the Constitution's structure—they uphold it.

In sum, we will not transgress the boundaries of our constitutional authority to perform our own analysis of Columbia's domestic law or offer our own evaluation of Columbia's conduct under the Treaty.  It is enough for us to say that we accept the Executive Branch's determination that it is still in force.

B.

Turning to Arias's other arguments, we conclude that the district court did not err in finding that the Treaty covers the two offenses charged in the extradition complaint.  Article 2 defines "Extraditable Offenses" as crimes that are "punishable under the Federal laws of the United States and the laws of the Republic of Colombia."  Extradition Treaty, Colom.-U.S., *supra*, art. 2, S. Treaty Doc. No. 97-8, at 1.  This requirement, known as "the dual or double criminality principle," marks a standard provision in "[m]ost extradition treaties."  *United States v. Herbage*, 850 F.2d 1463, 1465 (11th Cir. 1988).  Simply put, the rule provides that the fugitive's charged conduct must "constitute an offense in both the requesting and requested states."  *Id.*; *see also Gallo-Chamorro v. United States*, 233 F.3d 1298, 1306 (11th Cir. 2000) (*Gallo-Chamorro II*) (explaining that dual criminality "mandates that a prisoner be extradited only for conduct that constitutes a serious offense in both the requesting and surrendering country").  In other

21

words, courts ask whether the conduct that the government describes would violate our laws if it occurred in this country.

Here, the answer is yes. The acts charged in this case—the embezzlement of government funds and the knowingly false designation of government contracts—would violate federal law if those acts occurred here. Importantly, we need not compare each country's criminal code and ask whether a given Colombian statute has an exact American analog. The "name by which the crime is described in the two countries" need not be the same. *Collins v. Loisel*, 259 U.S. 309, 312 (1922). Nor does "the scope of the liability" need to "be coextensive." *Id.*; *see also Wright v. Henkel*, 190 U.S. 40, 58 (1903) ("Absolute identity is not required."). Dual criminality "does not require that the elements, purposes, or punishment for foreign offenses be identical to ours." *United States v. Riviere*, 924 F.2d 1289, 1302 (3d Cir. 1991). It is enough that the "essential character of the transaction is the same, and made criminal." *Wright*, 190 U.S. at 58. Here, the district court found that the charged conduct would violate at least two federal statutes—namely, 18 U.S.C. § 641, which prohibits diverting government funds for one's own use or the use of another; and 18 U.S.C. § 1001, which prohibits making false statements in any matter within the jurisdiction of a federal agency.

On the embezzlement charge, Arias argues that the charged conduct would not violate United States law because the Colombian government alleged only that he "allowed" others to commit fraud and not that he knowingly participated in their scheme. He insists that federal law does not criminalize the mere failure to prevent third party wrongdoing, which, in his view, is all that happened here. His point,

however, mischaracterizes the extradition complaint, which states that he not only "knew about" the improper diversion of government funds to undeserving recipients but actually "ensured the favorable treatment." The complaint further alleges that Arias wielded his influence over the IICA-managed grant process "to direct the public funds to specific agricultural sectors"—namely, "areas that were politically strategic to his presidential aspirations." Whether or not he committed such acts, we cannot say that the district court erred in concluding that the conduct as alleged would violate our own prohibition on diverting government funds.

As for the contracts charge, Arias asserts that the Colombian regulation defining the terms "scientific or technological" is so vague that his designations could not have been materially false, and thus would not violate United States law. But that argument would require us to adjudicate the *merits* of the charge—that is, decide whether Arias's designations were false. The dual criminality inquiry asks only whether "the particular *act charged*," taken as true, would be "criminal in both jurisdictions." *Collins*, 259 U.S. at 312 (emphasis added); *see also Gallo-Chamorro II*, 233 F.3d at 1307 (explaining that "dual criminality focuses on *the characterization* of the acts of the defendant" (emphasis added)). It also does not matter whether a vagueness challenge to a foreign statute would succeed so long as the particular conduct at issue would violate our domestic law. *Cf. Man-Seok Choe v. Torres*, 525 F.3d 733, 738 (9th Cir. 2008) ("The fact that the Korean law is broader than ours, and thus punishes conduct that would not be unlawful here, is of no consequence, so long as the particular conduct Choe is charged with is prohibited in both countries."). As we have explained, the fact that "defenses may

23

be available" in the United States "that would not be available" in Colombia "does not defeat extradition under the dual criminality principle." *Gallo-Chamorro II*, 233 F.3d at 1307 (quoting Restatement (Third) of Foreign Relations Law § 476 cmt. d (1987)). Given that the act charged—the knowingly false designation of government contracts—would violate our federal law, the dual criminality requirement is satisfied.

And let us reiterate—a conclusion that the acts charged would be illegal in the United States is not the equivalent of a conclusion that the foreign fugitive committed them. After all, when assessing dual criminality, we look only at the charges on paper; it is up to the courts of the requesting country to adjudicate their merits.

## C.

Finally, we conclude that the evidence meets the Treaty's requirements for extraditing individuals who have already been convicted. The Treaty provides that when an extradition request "relates to a *convicted* person," such as Arias, the requesting party needs to submit only a "copy of the judgment" and evidence "proving that the person sought is the person to whom the conviction refers." Extradition Treaty, Colom.-U.S., *supra*, art. 9(4), S. Treaty Doc. No. 97-8, at 4 (emphasis added). Neither party disputes that Arias was convicted or that Colombia submitted the required proof here.[4] We cannot weigh the underlying

---

[4] Article 9(3), by contrast, provides that when one country seeks to extradite an individual "who has not been convicted," the requesting party must submit evidence that "would provide probable cause to suspect" that the fugitive "has committed the offense." Extradition Treaty, Colom.-U.S., *supra*, art. 9(3), S. Treaty Doc. No. 97-8, at 4.

24

evidence ourselves to gauge whether we would agree with that conviction.  As we have explained, on habeas corpus review, our review is "limited to determining . . . whether there was any evidence warranting the finding that there was reasonable ground to believe the accused guilty."  *Martin*, 993 F.2d at 828 (internal quotation marks omitted).  Such evidence can of course include the fact that a foreign tribunal has convicted the defendant.  *See Spatola v. United States*, 925 F.2d 615, 618 (2d Cir. 1991) ("[A] certified copy of a foreign conviction, obtained following a trial at which the defendant was present" constitutes sufficient evidence.).

Arias concedes this "general rule" but argues that it cannot apply "in this novel situation" because his conviction was the product of a "corrupt, biased court."  Given that alleged injustice, Arias claims that "Article 9(4) of the Treaty does not resolve the matter."  In his view, we cannot credit such politically tainted convictions.  Yet neither the Treaty nor any other law carves out this sort of exception—at least not one that the judiciary can invoke.  And although the Treaty does prohibit extraditions based on requests "of a political character," it reserves those determinations for the "*Executive Authority* of the Requested State." Extradition Treaty, Colom.-U.S., *supra*, art. 4, S. Treaty Doc. No. 97-8, at 2 (emphasis added).  So, while Arias may raise serious concerns about the motivation for his prosecution, the fairness of his trial, and the severity of his sentence, he must direct those complaints to the Executive Branch.  *See Martin*, 993 F.2d at 830 (instructing fugitive to "direct his argument that extradition is unjust . . . to the Executive Branch"); *cf. Glucksman v. Henkel*, 221 U.S. 508, 512

25

(1911) (Holmes, J.) ("We are bound by the existence of an extradition treaty to assume that the trial will be fair.").

To hold otherwise would also contravene the "rule of non-inquiry," which precludes courts "from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request." *Martin*, 993 F.2d at 829. Like "extradition procedures generally," the rule flows from "concerns about institutional competence and by notions of separation of powers." *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997). We have neither the power nor competence to consider a foreign fugitive's concerns about the fairness of his country's criminal justice system, let alone halt his extradition on that basis—that kind of consideration is properly addressed to the Executive Branch. *See Martin*, 993 F.2d at 830. To that end, the rule also "serves interests of international comity by relegating to political actors the sensitive foreign policy judgments that are often involved in the question of whether to refuse an extradition request." *Hoxha v. Levi*, 465 F.3d 554, 563 (3d Cir. 2006).

The rule applies even though a foreign court's procedures might differ from our own traditions. *See Martin*, 993 F.2d at 830 ("When a defendant is tried in a foreign country, he or she is entitled only to the procedural protections accorded by foreign law."). And it applies even when humanitarian concerns are at stake. *See id.* at 830 n.10 (noting that "judicial intervention in extradition proceedings based on humanitarian considerations is inappropriate" (citing *Escobedo*, 623 F.2d at 1107)). Those judgments are simply not ours to make. As the government warns, labeling a foreign court as corrupt "could have serious foreign-relations

26

implications."  Consistent with the rule of non-inquiry, we defer to the Executive to weigh those implications here.  *See Kin-Hong*, 110 F.3d at 111 (explaining that "there is another branch of government, which has both final say and greater discretion in these proceedings, to whom these questions are more properly addressed").

### D.

We likewise reject Arias's attempt to invoke the act-of-state doctrine, "a judicially-created rule of decision that 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'"  *Glen v. Club Méditerranée, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).  The Supreme Court has described the doctrine "as a consequence of domestic separation of powers, reflecting 'the strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs."  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 404 (1990) (quoting *Sabbatino*, 376 U.S. at 423).  Arias reasons that his actions as Minister of Agriculture qualified as official acts of Colombia, and so the magistrate judge should have abstained from passing upon the legality of that conduct.  In essence, he asks us to thwart the Executive's efforts to extradite him in the name of a doctrine meant *to avoid* hindering the Executive's conduct of our foreign affairs.

That argument fails for numerous reasons, including and especially that magistrate judges do not decide the *legality* of a fugitive's conduct—as we have

27

explained, they do not "inquire into the guilt or innocence of the accused." *Kastnerova*, 365 F.3d at 987; *see also Shapiro v. Ferrandina*, 478 F.2d 894, 900 (2d Cir. 1973) (Friendly, J.) (explaining that "the function of the extraditing magistrate is not to decide guilt or innocence"). Indeed, the whole point of extradition is to permit the requesting country—here, Colombia—to make (or enforce) its own determination. *See Sayne v. Shipley*, 418 F.2d 679, 685 (5th Cir. 1969) (explaining that "it would defeat the whole object of extradition if a complete trial were necessary prior to extradition" (internal quotation marks and citation omitted)). Because nothing in this case possibly requires us "to declare invalid" Colombia's official acts, "the factual predicate for application of the act of state doctrine does not exist." *Kirkpatrick*, 493 U.S. at 405.

\*　　\*　　\*

At the end of the day, we do not consider or decide whether the United States *should* extradite Arias. Indeed, we cannot; that judgment rests with the Executive Branch alone. Mindful of our modest role, we hold simply that the law does not preclude it.

**AFFIRMED.**